AP-77,036
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 4/27/2015 12:00:00 AM
Accepted 4/27/2015 8:53:11 AM
ABEL ACOSTA
CLERK

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### No. AP-77,036

FILED IN
COURT OF CRIMINAL APPEALS

April 28, 2015

ABEL ACOSTA, CLERK

**JUAN BALDERAS**
 *Appellant*,

**v.**

**THE STATE OF TEXAS**

On Direct Appeal from the 179th District Court of Harris, Texas; Cause No. 1412826.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THIS IS A DEATH PENALTY CASE

---

# BRIEF FOR APPELLANT

---

ORAL ARGUMENT REQUESTED

**R. Scott Shearer**
TBA No. 00786464
917 Franklin, Suite 320
Houston, Texas 77002
(713) 254-5629
(713) 224-2889 FAX
*ShearerLegal@Yahoo.com*

**Attorney for Appellant
(court-appointed)**

April 25, 2015

# STATEMENT REGARDING ORAL ARGUMENT

The Appellant hereby requests oral argument in this cause.  *See* TEX. R. APP. PROC. 39.7.

## IDENTITY OF PARTIES AND COUNSEL

In accordance with TEX. R. APP. PROC. 38.1(a), Appellant submits the following are interested parties:

**R. Scott Shearer** -             **Attorney for Appellant (Trial & appeal).**

917 Franklin, Suite 320, Houston, TX 77002

**Alvin Nunnery** -             **Trial Counsel for Appellant**

909 Texas, Suite 205, Houston, TX 77002

**Jerome Godinich, Jr.**             **Trial Counsel for Appellant**

917 Franklin, Suite 320, Houston, TX 77002

**Robert R. "Bob" Scott**             **Trial Counsel for Appellant**

5803 2nd Street, Suite 101, Katy, TX 77493

**Juan Balderas** -             **Appellant.**

TDCJ # 00999590, Allan B. Polunsky Unit, 3872 FM 350 South
Livingston, TX 77351

**Traci Bennett** -             **Trial counsel for the State of Texas.**
**Caroline Dozier**
**Mary McFaden**

District Attorney's Office, 1201 Franklin, Houston, TX 77002

**Alan Curry**-             **Appellate counsel for the State of Texas.**

District Attorney's Office, 1201 Franklin, Houston, TX 77002

**Hon. Kristin M. Guiney** -       **Presiding judge of the Trial Court.**

179th District Court, 1201 Franklin, Houston, TX 77002

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT………………….  ii

IDENTITY OF PARTIES AND COUNSEL……………………….  iii

INDEX OF AUTHORITIES……………………………………..  vi-xiii

STATEMENT OF THE CASE……………………………........  2

ISSUES PRESENTED…………………………………………  3

SUMMARY OF THE ARGUMENT………………………………..  5

ARGUMENT……………………………………………………..  8

    Statement of Facts………………………………………..  8

    Issue Number One……………………………………….  19

ISSUE NUMBER ONE: WAS THE EVIDENCE LEGALLY
SUFFICIENT TO SUPPORT THE VERDICT?

(RR XXIV at 30 – RR XXIX at 69)

    Issue Number Two…………………………………………  24

ISSUE NUMBER TWO: WAS THE APPELLANT DENIED HIS
SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL?

(CR at 3121)(RR XXII at 5)

Issue Number Three……………………………………….................. 37

ISSUE NUMBER THREE: DOES A CRIMINAL DEFENDANT HAVE A SIXTH AMENDMENT RIGHT UNDER THE UNITED STATES CONSTITUTION TO CONFRONT HIS ACCUSER IN THE ENGLISH LANGUAGE WHERE THE WITNESS SPEAKS, UNDERSTANDS, AND IS FLUENT IN ENGLISH?

(CR at 3230)(RR XXVI at 5)

Issue Number Four……………………………………….................. 58

ISSUE NUMBER FOUR:  IF A CRIMINAL DEFENDANT DOES NOT HAVE A SIXTH AMENDMENT RIGHT UNDER THE UNITED STATES CONSTITUTION TO CONFRONT HIS ACCUSER IN ENGLISH, DOES HE AT LEAST HAVE THE RIGHT TO CROSS-EXAMINE AND IMPEACH HIS ACCUSER CONCERNING HER ABILITY TO SPEAK ENGLISH SO THAT THE JURY MIGHT BE MADE AWARE OF HER ATTEMPT TO MASK THE EXTENT OF HER FLUENCY?

(RR XXIX 62-63)

Issue Number Five.……………………………………….................. 67

ISSUE NUMBER FIVE:  DID THE TRIAL COURT ABUSE ITS DISCRETION BY ALLOWING WENDY BARDALES TO TESTIFY IN SPANISH?

(RR XXIX at 62-63)

Issue Number Six...……………………………………….................. 70

ISSUE NUMBER SIX:  DID THE TRIAL COURT VIOLATE THE RULE OF *GASKIN V. STATE* BY PREVENTING APPELLANT FROM IMPEACHING THE WITNESS WENDY BARDALES WITH THE PRIOR AUDIOTAPED STATEMENT SHE GAVE TO THE POLICE?

(RR XXIX 62-63)

Issue Number Seven...…………………………………….................. 74

ISSUE NUMBER SEVEN: WAS THE APPELLANT DEPRIVED OF DUE PROCESS OF LAW AND AN IMPARTIAL JURY BY AN OUTSIDE INFLUENCE ACTING UPON THE JURY DURING THEIR DELIBERATIONS?

(RR III at 370-371)

Issue Number Eight…………………………………….................. 78

ISSUE NUMBER EIGHT: WAS THE APPELLANT DEPRIVED OF DUE PROCESS OF LAW WHEN THE TRIAL COURT FAILED TO SUPPRESS BOTH THE IN-COURT AND OUT-OF-COURT IDENTIFICATIONS OF THE APPELLANT?

(RR XXV at 179)

Issue Number Nine.…………………………………….................. 89

ISSUE NUMBER NINE: DID THE TRIAL COURT ABUSE ITS DISCRETION BY FAILING TO HAVE TESTIMONY READ BACK IN RESPONSE TO TWO JURY NOTES?

(CR at 3295, 3297)(RR XXXI at 4-7)

PRAYER FOR RELIEF……………………………………….…… 100

CERTIFICATE OF COMPLIANCE……………………….............. 101

CERTIFICATE OF SERVICE………………………….............. 102

# INDEX OF AUTHORITIES

**Page**

**CASES**

*Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218 (1931) ....................................43

*Artell v. State*, 372 S.W.2d 944 (Tex. Cr. App. 1963)..............................................70

*Baltierra v. State,* 586 S.W.2d 556 (Tex. Cr. App. 1979) ............................... 48, 67

*Barker v. Wingo*, 407 U.S. 514 (1972) ....................................................................28

*Barley v. State,* 906 S.W.2d 27 (Tex. Cr. App. 1995), *cert. denied,* 516 U.S. 1176

   (1996) ................................................................................................ 79, 80, 82

*Beckham v. State*, 29 S.W.3d 148 (Tex. App. - Houston [14th Dist.] 2000, pet.

   ref'd)......................................................................................................20

*Brookhart v. Janis*, 384 U.S. 1 (1966) ....................................................................45

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010........................................19

*Brown v. State*, 29 S.W.3d 251 (Tex. App. - Houston [14th Dist.] 2000, no pet.)..80

*Brown v. State*, 870 S.W.2d 53 (Tex. Cr. App. 1994) ..............................................94

*California v. Green*, 399 U.S. 149 (1970) ......................................................... 41, 43

*Chapman v. Evans*, 744 S.W.2d 133 (Tex. Cr. App. 1988) ....................................29

*Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798 (1988) ........................................ 42, 52

*Cullen v. State*, 719 S.W.2d 195 (Tex. Cr. App. 1986) ..................................... 70, 71

*Curry v. State*, 30 S.W.3d 394 (Tex. Cr. App. 2000) ..............................................21

*Dao v. State*, 337 S.W.3d 927 (Tex. App. - Houston [14 Dist.] 2011)....................49

*Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105 (1974)........................................ 41, 44

*DeGraff v. State*, 962 S.W.2d 596 (Tex. Cr. App.1998) .........................................93

*Delaware v. Fensterer*, 474 U.S. 15, 106 S.Ct. 292 (1985) ...................................47

*Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431 (1986)............................56

*Delk v. State*, 855 S.W.2d 700 (Tex. Cr. App. 1993) .............................................80

*Diaz v. State*, 491 S.W.2d 166 (Tex. Cr. App. 1973) ....................................... 53, 69

*Doggett v. United States*, 505 U.S. 647, 112 S.Ct. 2686 (1992) ............................30

*Dragoo v. State*, 96 S.W.3d 308 (Tex. Cr. App. 2003) ..........................................35

*Ex parte McKenzie*, 491 S.W.2d 122 (Tex. Cr. App. 1973)...................................32

*Flores v. State*, 509 S.W.2d 580 (Tex. Cr. App. 1974) ..........................................49

*Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127 (1969)......................................82

*Garcia v. State*, 12 Tex. App. 335 (Tex. Ct. App. 1882)........................................50

*Garcia v. State*, 472 S.W.2d 784 (Tex. Cr. App. 1971) .................................. 22, 86

*Garcia v. State*, 887 S.W.2d 862 (Tex. Cr. App. 1994) .........................................59

*Gaskin v. State*, 172 Tex.Cr.R. 7, 353 S.W.2d 467 (1961)....................................70

*Goldberg v. State,* 95 S.W.3d 345 (Tex. App. - Houston [1st Dist.] 2002, pet.

  ref'd), *cert. denied,* 540 U.S. 1190 (2004)..........................................................80

*Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362 (Tex. 2000).....................76

*Government of Virgin Islands v. Aquino*, 378 F.2d 540 (CA3 1967)............... 46, 47

*Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400 (1959) ..........................................43

*Guajardo v. State*, 999 S.W.2d 566 (Tex. App. - Houston [14th Dist.] 1999, pet.

 ref'd)..........................................................................................................................32

*Guillen v. State*, No. 01-12-01085-CR (Tex. App. -  Houston [1st Dist.] April 8,

 2014) (mem. op., not designated for publication)...................................................97

*Hooper v. State*, 214 S.W.3d 9 (Tex. Cr. App. 2007)...............................................21

*Howell v. State*, 175 S.W.3d 786 (Tex. Cr. App. 2005) ...........................................92

*In re Winship*, 397 U.S. 358, 90 S.Ct. 1068 (1970)..................................................19

*Iness v. State*, 606 S.W.2d 306 (Tex. Cr. App. 1980)......................................... 93, 94

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979).........................................19

*Johnson v. State,* 673 S.W.2d 190 (Tex. Cr. App. 1984) ..........................................23

*Jones v. State*, 706 S.W.2d 664 (Tex. Cr. App. 1986)....................................... 94, 99

*Keith v. State*, No. 06-06-00094-CR, 2007 WL 654282, at *4 (Tex. App. -

 Texarkana March 6, 2007, no pet.) (mem. op., not designated for publication) ..95

*King v. State*, 29 S.W.3d 556 (Tex. Cr. App. 2000) ..................................................21

*Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967)..............................................28

*Kuciemba v. State*, 310 S.W.3d 460 (Tex. Cr. App. 2010)........................................21

*Laster v. State*, 275 S.W.3d 512 (Tex. Cr. App. 2009).............................................19

*Loserth v. State*, 963 S.W.2d 770 (Tex. Cr. App. 1998)............................................80

*Madden v. State*, 799 S.W.2d 683 (Tex. Cr. App. 1990), *cert. denied*, 499 U.S. 954,

111 S.Ct. 1432 (1991) ...............................................................................................80

*Malik v. State*, 953 S.W.2d 234 (Tex. Cr. App. 1997) ............................................20

*Manley v. AmBase Corp.*, 337 F.3d 237 (2d Cir.2003) ...........................................77

*Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243 (1977) .....................................81

*Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337 (1895) ...................................46

*May v. State*, 139 S.W.3d 93 (Tex. App. - Texarkana 2004, pet. ref'd)..................95

*McKinney v. State*, 491 S.W.2d 404 (Tex. Cr. App. 1973) .....................................29

*McQuarrie v. State*, 380 S.W.3d 146 (Tex. Cr. App. 2012)............................ 76, 77

*Mendez, Jr., v. State*, No. 2-07-417-CR (Tex. App. - Fort Worth February 12,

2009) (mem. op., not designated for publication).................................................96

*Miller v. State,* 177 S.W.3d 1 (Tex. App. - Houston [1st Dist.] 2004, no pet.).......49

*Moore v. State,* 140 S.W.3d 720 (Tex. App. - Austin 2004, pet. ref'd) ..................81

*Moore v. State*, 874 S.W.2d 671 (Tex. Cr. App. 1994) ...........................................93

*Napue v. Illinois*, 360 U.S. 264 (1959) ...................................................................44

*Neal v. State*, 108 S.W.3d 577 (Tex. App. - Amarillo 2003, no pet.) ....................95

*Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375 (1972)......................................... 79, 81

*Ohio v. Roberts*, 448 U.S. 56 (1980) ......................................................................47

*Parkerson v. State,* 942 S.W.2d 789 (Tex. App. - Fort Worth 1997, no writ) ........31

*Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065 (1965) ......................... 41, 42, 43, 44

*Pugh v. State*, 376 S.W.2d 760 (Tex. Cr. App. 1964) ...............................................94

*Pyles v. Johnson*, 136 F.3d 986 (5th Cir.1998)........................................................76

*Randon v. State*, 107 S.W.3d 646 (Tex. App. -Texarkana 2003, no pet.) ...............95

*Robison v. State*, 888 S.W.2d 473 (Tex. Cr. App. 1994), *cert. denied*, 515 U.S.

1162 ........................................................................................................ 94, 96

*Rodriquez v. State*, 227 S.W.3d 842 (Tex. App. - Amarillo 2007, no pet.).............33

*Shaw v. State*, 117 S.W.3d 883 (Tex. Cr. App. 2003) ....................................... 29, 33

*Simmons v. United States,* 390 U.S. 377, 88 S. Ct. 967 (1968).................... 79, 80, 81

*Smith v. State*, 65 S.W.3d 332, (Tex. App. - Waco, 2001, no pet.) .........................70

*Smith v. State,* 986 S.W.2d 86 (Tex. App. - Houston [1st Dist.] 1999, pet. ref'd)..19

*State v. Burckardt,* 952 S.W.2d 100 (Tex. App. - San Antonio 1997, no pet.) .......36

*State v. Burris,* 131 Ariz. 563 P.2d 8 (App. 1982) .................................................59

*State v. Guerrero*, 110 S.W.3d 155 (Tex. App. - San Antonio 2003, no pet.) . 32, 35

*State v. Jones*, 168 S.W.3d 339 (Tex. App. - Dallas 2005, pet. ref'd.) ...................33

*State v. Munoz,* 991 S.W.2d 818 (Tex. Cr. App. 1999)..................................... 28, 30

*State v. Rangel*, 980 S.W.2d 840 (Tex. App. - San Antonio 1998, no pet.)..... 30, 31

*Stock v. State,* 214 S.W.3d 761 (Tex. App. - Austin 2007, no pet.) ........................34

*The Ottawa*, 70 U.S. 268, 18 L.Ed. 165 (1866).....................................................43

*Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211 (1982)............................................20

*Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546 (1965).................................. 44, 76

*Turner v. State*, 486 S.W.2d 797 (Tex. Cr. App. 1972)...................................... 22, 86

*Turner v. State*, 504 S.W.2d 843 (Tex. Cr. App. 1974)...............................................29

*United States v. Abel*, 469 U.S. 45 (1984) ............................................................44

*United States v. Lloyd*, 269 F.3d 228 (3d Cir.2001) ...............................................77

*United States v. Manos,* 848 F.2d 1427 (7th Cir.1988) ............................................59

*United States v. Marion*, 404 U.S. 307 (1971) .......................................................31

*Vargas v. State*, 627 S.W.2d 785 (Tex. Cr. App. 1982) ...........................................49

*Villarreal v. State*, 286 S.W.3d 321 (Tex. Cr. App. 2009) ......................................20

*Webb v. State*, 760 S.W.2d 263 (Tex. Cr. App. 1988)........................................ 80, 81

*White v. State*, 225 S.W.3d 571 (Tex. Cr. App. 2007) ............................................76

*White v. State*, 496 S.W.2d 642 (Tex. Cr. App. 1973) ............................................70

*Williams v. State*, 235 S.W.3d 742 (Tex. Cr. App. 2007).......................................20

*Williams v. State*, 675 S.W.2d 754 (Tex. Cr. App. 1984)........................................82

*Wingo v. State*, 143 S.W.3d 178 (Tex. App. - San Antonio 2004), *aff'd*, 189 S.W.3d 270 (Tex. Cr. App. 2006) ................................................................................94

*Wright v. State*, 12 Tex. App. 163 (1882)...............................................................50

*Zamorano v. State*, 84 S.W.3d 643 (Tex. Cr. App. 2002) ................................. 28, 29

*Zanders v. State*, 480 S.W.2d 708 (Tex. Cr. App. 1972)........................................70

**STATUTES**

TEX. CRIM. PROC. CODE ANN. art. 35.16(a)(11) ......................................................51

TEX. CRIM. PROC. CODE ANN. art. 36.28.......................................................................93

TEX. CRIM. PROC. CODE ANN. art. 38.03 ......................................................................19

TEX. CRIM. PROC. CODE ANN. art. 38.04 ......................................................................20

TEX. CRIM. PROC. CODE ANN. art. 38.30........................................... 50, 52, 67, 69

TEX. PENAL CODE §19.03....................................................................................24

TEX. R. APP. PROC. 38.1(a)...................................................................................... ii

TEX. R. APP. PROC. 39.7 .......................................................................................... i

## OTHER AUTHORITIES

Pinkerton, James and Rogers, Brian; *"Right to a Speedy Trial? Ask these defendants"* Houston Chronicle – August 24, 2013 ..............................................34

## RULES

TEX. R. EVID. 615.............................................................................. 70, 71

TEX. R. EVID. 615(f)(2) ......................................................................71

## TREATISES

J.E. Macy, Annotation, *Use of Interpreter in Court Proceedings*, 172 A.L.R. 923 (1948) .................................................................................................59

Pollitt, *The Right of Confrontation: Its History and Modern Dress*, 8 J.Pub.L. 381, 384-387 (1959).................................................................................42

## CONSTITUTIONAL PROVISIONS

TEX. CONST. art. I, §10................................................................. 28, 41

U.S. CONST. AMEND. VI ............................................................ 28, 40, 41

U.S. CONST. AMEND. XIV ...............................................................28

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

No. AP-77,036

**JUAN BALDERAS**
*Appellant,*

**v.**

**THE STATE OF TEXAS**

On Direct Appeal from the 179th District Court of Harris, Texas; Cause No. 1412826.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THIS IS A DEATH PENALTY CASE

_____

# BRIEF FOR APPELLANT

_____

**JUAN BALDERAS**, by and through counsel on appeal, files this his Brief for Appellant. In support of his prayer for reversal he would respectfully show the Court the following:

1

**STATEMENT OF THE CASE**

This appeal stems from Appellant's conviction in *State of Texas v. Juan Balderas*. Appellant was charged in the 179ᵗʰ District Court of Harris County, Texas in cause number 1412826 with the offense of capital murder. See TEX. PENAL CODE §19.03. (CR at 2). Appellant proceeded to a jury trial and was found guilty by the jury. (CR at 3284). On March 14, 2014, the jury assessed punishment at death. (CR at 3342, 3343). The Appellant filed a motion for new trial, which was presented to the court (CR at 3388, 3408) and overruled without a hearing. (CR at 3409). The Appellant perfected his appeal when he filed a timely notice on April 21, 2014. (CR at 3360).

_____

* The record on appeal is cited as follows in this brief:

CR at page *p* ……. Clerk's record at page *p*.

RR *v* at *p* ……. Reporter's record volume *V* at page *p*.

**ISSUES PRESENTED**

ISSUE NUMBER ONE: WAS THE EVIDENCE LEGALLY SUFFICIENT TO SUPPORT THE VERDICT?

(RR XXIV at 30 – RR XXIX at 69)

ISSUE NUMBER TWO: WAS THE APPELLANT DENIED HIS SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL?

(CR at 3121)(RR XXII at 5)

ISSUE NUMBER THREE: DOES A CRIMINAL DEFENDANT HAVE A SIXTH AMENDMENT RIGHT UNDER THE UNITED STATES CONSTITUTION TO CONFRONT HIS ACCUSER IN THE ENGLISH LANGUAGE WHERE THE WITNESS SPEAKS, UNDERSTANDS, AND IS FLUENT IN ENGLISH?

(CR at 3230)(RR XXVI at 5)

ISSUE NUMBER FOUR:  IF A CRIMINAL DEFENDANT DOES NOT HAVE A SIXTH AMENDMENT RIGHT UNDER THE UNITED STATES CONSTITUTION TO CONFRONT HIS ACCUSER IN ENGLISH, DOES HE AT LEAST HAVE THE RIGHT TO CROSS-EXAMINE AND IMPEACH HIS ACCUSER CONCERNING HER ABILITY TO SPEAK ENGLISH SO THAT THE JURY MIGHT BE MADE AWARE OF HER ATTEMPT TO MASK THE EXTENT OF HER FLUENCY?

(RR XXIX 62-63)

3

ISSUE NUMBER FIVE:  DID THE TRIAL COURT ABUSE ITS DISCRETION BY ALLOWING WENDY BARDALES TO TESTIFY IN SPANISH?

(RR XXIX at 62-63)

ISSUE NUMBER SIX:  DID THE TRIAL COURT VIOLATE THE RULE OF *GASKIN V. STATE* BY PREVENTING APPELLANT FROM IMPEACHING THE WITNESS WENDY BARDALES WITH THE PRIOR AUDIOTAPED STATEMENT SHE GAVE TO THE POLICE?

(RR XXIX 62-63)

ISSUE NUMBER SEVEN: WAS THE APPELLANT DEPRIVED OF DUE PROCESS OF LAW AND AN IMPARTIAL JURY BY AN OUTSIDE INFLUENCE ACTING UPON THE JURY DURING THEIR DELIBERATIONS?

(RR III at 370-371)

ISSUE NUMBER EIGHT: WAS THE APPELLANT DEPRIVED OF DUE PROCESS OF LAW WHEN THE TRIAL COURT FAILED TO SUPPRESS BOTH THE IN-COURT AND OUT-OF-COURT IDENTIFICATIONS OF THE APPELLANT?

(RR XXV at 179)

ISSUE NUMBER NINE: DID THE TRIAL COURT ABUSE ITS DISCRETION BY FAILING TO HAVE TESTIMONY READ BACK IN RESPONSE TO TWO JURY NOTES?

(CR at 3295, 3297)(RR XXXI at 4-7)

4

## SUMMARY OF THE ARGUMENT

This present litigation reveals a capital murder case with one very large problem for the State of Texas. The problem was, the only person who claimed to have gotten a good look at the shooter's face gave a written statement to the police just after the murder that said she had never seen the shooter before, when she had seen the Appellant, her childhood friend and rival gang member, just weeks before the shooting. She had known him for at least a year before the murder; had been to his apartment; and had hung out with him and his friends. This witness gave grossly inconsistent details about the facts of the case, including misidentifying the murder weapon and claiming to be shot at when the ballistics proved otherwise. She would not have failed to recognize the Appellant if he was the shooter. Therefore, there was insufficient evidence to show that Appellant was the person who shot the victim.

The case languished on the docket for eight [8] years - a sure sign of a lack of motivation on the part of the district attorneys sequentially assigned to the case. This deprived the Appellant of his right to a speedy trial. Once the case reached the point of being tried, the State made a last minute deal with a snitch in order to give the jury some meager evidence to prove Appellant was the perpetrator.

Appellant sought to suppress both the eyewitness' in-court and out-of-court identifications of the Appellant. The photo spread was so suggestive and the

reliability of the eyewitness's identification was so weak that neither should have been permitted in court. This deprived the Appellant of due process of law.

In addition to making a last minute deal with a snitch, the final set of prosecutors assigned to the case figured out a way to solve the problems with their eyewitness. They would claim a "language barrier" that did not exist. The State conceded that the eyewitness spoke English, but insisted on a Spanish language interpreter for her "comfort" when testifying. The police officers who interviewed the eyewitness after the murder testified that there was no such language barrier. Appellant objected to the use of the interpreter and filed a motion to conduct his cross-examination in English. The trial court denied the motion, abusing its discretion and denying the Appellant his Sixth Amendment right to confront the eyewitness and to cross-examine her in the English language. The jury was deprived of the ability to observe the demeanor and manner of the eyewitness, effectively placing a shield between her and the jury through the use of an unnecessary interpreter.

After his motion was denied, and the eyewitness was allowed to testify in Spanish, Appellant sought to impeach the eyewitness with her previous audiotape recording that was given to the lead investigator in English. The trial court refused its admission, denying Appellant the ability to challenge the eyewitness' numerous claims that the police did not understand her. This deprived Appellant of his Fifth

and Fourteenth Amendment rights to due process and his Sixth Amendment right to confrontation as well as denying him the use of the audiotape under the *Gaskin* Rule.

The trial court further abused its discretion by failing to answer two jury notes that sought to have testimony read back where the lead investigator indicated he would have questioned the eyewitness' credibility if he had known she had seen the Appellant just weeks before the murder. This deprived the jury of the means to resolve their dispute in Appellant's favor and unnecessarily bolstered the State's case.

Finally, the jury was subjected to an outside influence when the Appellant's schizophrenic brother waived at the jury as they were being taken to their hotel. This caused such fear and consternation amongst the jurors that they reached a verdict in just two hours of deliberations the following morning – despite being hung at the conclusion of the previous day. This deprived Appellant of due process and the right to an impartial jury.

## ARGUMENT

STATEMENT OF FACTS

In 2005, Karen Bardales was living at an apartment complex at 7700 Corporate Drive in Houston Texas. (RR XXIV at 32). Karen Bardales was originally from Honduras. (RR XXIV at 31). Karen had a boyfriend named Eduardo Hernandez. (RR XXIV at 38). She met Eduardo through her sister Wendy Bardales. (RR XXIV at 34). Karen and Eduardo Hernandez had been dating approximately four months. (RR XXIV at 35). Eduardo was a member of a gang known as the La Tercera Crips. (RR XXIV at 40). Karen, on the other hand, associated with the MS-13 and Southwest Cholo gangs. (RR XXIV at 41). Wendy also associated with the MS-13 gang. (RR XXIV at 236). Karen and Eduardo would often hang out their friend Durhan Decorado's apartment, which was in the same complex as Karen lived. (RR XXIV at 42, 227). They would frequently drink and smoke marijuana there. (RR XXIV at 84-85).

On December 6, 2005, a friend of Eduardo Hernandez came over to Durjan's apartment. (RR XXIV at 237-238). He was wearing an HEB shirt and was a member of the La Tercera Crips (LTC). (RR XXIV at 239). Karen and Wendy Bardales began taunting this guy by saying "Fuck LTC" to him. (RR XXIV at 238). The guy pulled a gun on Karen Bardales. (RR XXIV at 238).

8

When he left the apartment, he wanted Eduardo Hernandez to go with him, but Eduardo refused. (RR XXIV at 238).

That same evening of December 6, 2005 Karen Bardales and Eduardo Hernandez returned to Durjan's apartment after visiting a friend. (RR XXIV at 49-50). As they walked through the door. Karen heard gunshots. (RR XXIV at 54). Eduardo pushed her to the ground. (RR XXIV at 54). Karen heard someone come inside the apartment but could not see the person. (RR XXIV at 55, 56). As she and Eduardo were laying on the ground, Karen saw a hand holding a pistol that was pointed at Eduardo's head. (RR XXIV at 56). The man with the gun shot Eduardo in the head. (RR XXIV at 57). Karen Bardales never saw the shooter's face. (RR XXIV at 105). Karen stayed at the scene and gave a statement to the police in English. (RR XXIV at 59, 65). The shooter was not the same person who came to the apartment earlier wearing an HEB shirt. (RR XXIV at 255).

Karen's sister Wendy Bardales was inside the apartment at the time of the shooting. (RR XXIV at 117). Wendy was sitting in the living room facing the television. (RR XXIV at 117). Wendy's boyfriend Edgar Ferrufino was also there. (RR XXIV at 243). Before he shot Eduardo Hernandez, the shooter pointed his gun directly into the face of Edgar Ferrufino. (RR XXIV at 246)(RR XXV at 26). Edgar described the gun as a silver magazine fed semi-automatic pistol. (RR XXIV at 265-266). Edgar described the shooter as wearing khaki

9

pants and a gray or black hoodie sweater. (RR XXV at 25). Edgar identified the shooter as being approximately 18 or 19 years old, 5 foot 8 inches tall, and weighing between 140 and 150 pounds. (RR XXIV at 253).

Wendy Bardales was called to the stand as a witness for the State. (RR XXV at 33). When she last met with the prosecutor before she testified, she spoke in English. (RR XXV at 34). At the time of her testimony, she could read English. (RR XXV at 69). Wendy Bardales came to the United States from Honduras at the age of 12. (RR XXV at 35). She learned English in school. (RR XXV at 35). Ms. Bardales was twenty-four years old at the time of her testimony. (RR XXV at 33).

In 2005, Ms. Bardales was fifteen years old and living with her mother and sister at an apartment on corporate drive. (RR XXV at 36). She was dating a boy named Edgar Ferrufino. (RR XXV at 36). Wendy Bardales knew the Appellant and had been over to his house on a few occasions. (RR XXV at 38)(RR XXVI at 16). Wendy and her sister Karen would often hang out at Durjan Decorado's apartment. (RR XXV at 45). On the night of the shooting, Wendy was seated on the floor by the couch in the living room. (RR XXV at 62, 181). When the shooter came into the apartment, she froze and could not move. (RR XXV at 185). Wendy saw the guy shoot Eduardo Hernandez in the head. (RR XXV at 186). The shooter was wearing a hoody type sweater, but the hood came off at one point and Wendy could clearly see his face. (RR XXV at 186). She did not recognize the

10

shooter at that time. (RR XXV at 186). Ms. Bardales had seen the Appellant around the apartment complex just a few weeks before the shooting. (RR XXV at 59). She told the police that she did not recognize the shooter. (RR XXV at 189). At trial, Ms. Bardales claimed that she could barely speak English at the time of the shooting. (RR XXV at 190). She wrote on the photo spread that she could understand English but that she could not write it. (RR XXV at 197).

Until the police showed her a picture on the Appellant in the photo spread, Ms. Bardales never mentioned to anyone that she thought the Appellant might have been the shooter. (RR XXVI at 36-37). In her statement given a few hours after the shooting, Ms. Bardales told the police she got a good look at the shooter's face. (RR XXVI at 54). She also told the police she did not know who the person was that did the shooting. (RR XXV at 64-65). She said she had never seen the shooter before. (RR XXV at 68)(RR XXVI at 55). In her written statement, Ms. Bardales told the police that the shooter had a dark birth mark on his face. (RR XXV at 70). Ms. Bardales agreed that the Appellant has no birthmark on his face. (RR XXVI at 62). Ms. Bardales said she had known the Appellant for at least a year before the shooting. (RR XXVI at 15, 69-70). Wendy Bardales described the shooter as holding a gun that was black. (RR XXVI at 78). The only portion of the alleged murder weapon that was black was the handle, which Wendy could not see. (RR XXVI at 79). The rest of the gun was gray. (RR XXVI at 79).

11

According to Sergeant Ruland, Wendy Bardales' description of the gun used by the shooter did not match the murder weapon. (RR XXVII at 53-54).

At trial, Ms. Bardales speculated that said she could have meant to say "mole" but that the police officer did not understand her and wrote down "birthmark". (RR XXV at 72). Ms. Bardales does not remember if she was referring to the mole as a birthmark. (RR XXV at 72-73). In the photo spread, the Appellant has a mark on the left side of his face. (RR XXV at 75). Ms. Bardales agreed that the mark on the Appellant's face seen in the photo spread was a scratch and not a birthmark. (RR XXV at 75).

Sergeant Tommy Ruland with the Houston Police Department was assigned to investigate the shooting of Eduardo Hernandez. (RR XXV at 78). He was the lead detective. (RR XXV at 79). The address he was given was 7700 Corporate drive, apartment 2307. (RR XXV at 79). Sergeant Ruland was given a general description of the suspected shooter. (RR XXV at 105-106). The shooter was described as a sixteen to eighteen year old Hispanic male, 5' 5" to 5' 8" feet tall, weighing approximately 140 to 155 pounds with a birthmark on his face. (RR XXV at 106). Sergeant Ruland arrived at the scene at 11:00 p.m. where he met with Wendy Bardales. (RR XXV at 79-80). Sergeant Ruland spoke to Wendy Bardales in English and had no difficulty understanding her. (RR XXV at 80). On December 7, 2005, Sergeant Ruland went to Ms. Bardales' home and showed her a

12

photo array. (RR XXV at 83-84). Once again he spoke to Wendy Bardales in English. (RR XXV at 85). Ms. Bardales did not appear to have any difficulty understanding or comprehending what Sergeant Ruland said to her. (RR XXV at 86). She did not appear to be in shock. (RR XXV at 87). On that day, Ms. Bardales did not tell Sergeant Ruland anything that would indicate that she knew the identity of the shooter. (RR XXV at 86).

On December 12, 2005, Sergeant Ruland initiated contact with Wendy Bardales. (RR XXV at 87). Ms. Bardales did not contact him with any new information between December 7th and December 12th. (RR XXV at 88). Sergeant Ruland went to her apartment and spoke to Ms. Bardales in English. (RR XXV at 89). Sergeant Ruland did not feel an interpreter was needed. (RR XXV at 90). Sergeant Ruland never said anything to Wendy Bardales that she did not appear to understand. (RR XXV at 90). Sergeant Ruland gave Wendy Bardales admonishments in English concerning the photo spread, which she indicated she understood. (RR XXV at 91-92). She never asked for the admonishments to be repeated. (RR XXV at 92).

Upon being shown the photo spread, Ms. Bardales pointed to the picture of the Appellant and said that she knew him and that he "looked like" the shooter. (RR XXV at 95). The photo of the Appellant contained in the photo spread was a booking photo from November of 2005. (RR XXV at 120). Ms. Bardales told

13

Sergeant Ruland that she had not seen the Appellant for six months. (RR XXV at 95). Ms. Bardales said that the face of the shooter and the Appellant appeared the same and that Appellant "could be" the shooter. (RR XXV at 96). Sergeant Ruland then ended the interview. (RR XXV at 96). Sergeant Ruland testified that he was confused by Ms. Bardales' statements and he made no attempt to classify her identification of the photo. (RR XXV at 97). On December 13, 2005, Sergeant Ruland again initiated contact with Wendy Bardales. (RR XXV at 97). Sergeant Ruland told Ms. Bardales that he needed to clarify her statements about the identification from the previous day. (RR XXV at 100). This time, upon viewing the photo spread again, Wendy Bardales made a definitive statement that the Appellant was the shooter. (RR XXV at 101). Before the photo spread was shown, Sergeant Ruland was told by Wendy Bardales that the shooter had a dark birth mark on his face. (RR XXV at 103). Only one other individual in the photo spread besides the Appellant had a mark on his face. (RR XXV at 104). Sergeant Ruland examined the Appellant's face at trial and agreed that the mark on his face in the photo spread was no longer present. (RR XXV at 106). The scratch on Appellant's face in the photo spread was not a birth mark or permanent mark. (RR XXV at 106). At no time during his numerous conversations with Wendy Bardales did Sergeant Ruland ever recall Ms. Bardales asking him to repeat or rephrase anything he said. (RR XXV at 104).

14

On December 15, 2005, Officer Eric Turmulen was tasked with serving an arrest warrant on the Appellant. (RR XXVI at 82-83). The Appellant fled on foot upon being approached by officers. (RR XXVI at 97). The Appellant was approached while he was carrying a cache of firearms, which he dropped. (RR XXVI at 98, 112). The cache or firearms included a pistol the State claimed was the murder weapon. (RR XXVIII at 40). Appellant was soon apprehended a short distance away, hiding under a car. (RR XXVI at 104). Testimony at trial indicated that the LTC gang held guns collectively, because there were not enough guns for each gang member. (RR XXVI at 190, 193)(RR XXVIII at 177).

The State called an informant to the stand by the name of Israel Diaz. (RR XXVI at 118). At the time of his testimony, Mr. Diaz had been in jail for seven years and four months. (RR XXVI at 121). In exchange for his testimony, the State agreed to reduce his capital murder charge to aggravated robbery. (RR XXVI at 123). Mr. Diaz's deal with the State did not materialize until approximately one week before testimony began in Appellant's trial. (RR XXVI at 174).

Israel Diaz was a member of the La Tercera Crips. (RR XXVI at 126). Israel Diaz had previously stolen a vehicle at gunpoint. (RR XXVI at 140). Mr. Diaz loaned the stolen vehicle to Eduardo Hernandez, who got caught by the police driving it. (RR XXVI at 140-141). Mr. Diaz became upset when Eduardo

15

Hernandez told the police that Mr. Diaz had stolen the vehicle. (RR XXVI at 141). In addition to the snitching issue, Eduardo Hernandez was seen in pictures throwing gang signs of a rival gang. (RR XXVI at 150). This, according to Mr. Diaz was the ultimate betrayal. (RR XXVI at 147). According to Israel Diaz, a meeting was called by the LTC gang members to discuss Eduardo Hernandez's disloyalty. (RR XXVI at 151). This meeting occurred three to four days before Mr. Hernandez was killed. (RR XXVI at 152). Once he was told of the murder, Mr. Diaz testified that he went to the scene of the crime and watched from across the street. (RR XXVI at 158). Israel Diaz claimed that the Appellant crossed the street and greeted him and some other LTC members who were watching the apartment complex. (RR XXVI at 159). According to Israel Diaz, the Appellant said he "got him" as the Appellant changed out the clip in a silver Berretta type pistol. (RR XXVI at 160).

Walter Benitez was called as a witness for the defense. Mr. Benitez had no criminal history. (RR XXVIII at 139). Walter Benitez was at the LTC meeting where the fate of Eduardo Hernandez was discussed. (RR XXVIII at 169). According to Mr. Benitez, Israel Diaz was at the meeting and was attempting to get the green light to kill Eduardo Hernandez. (RR XXVIII at 169). Walter Benitez also testified that the Appellant was trying to defend Eduardo Hernandez at the meeting. (RR XXVIII at 172). Walter Benitez testified that another LTC member,

16

Victor Arevalo showed him a gun and claimed that it was the gun with which he killed Eduardo Hernandez. (RR XXVIII at 225).

Celeste Munoz was not called as a witness by the defense, but testified outside the presence of the jury. (RR XXIX at 8). In the summer of 2005, Ms. Munoz witnessed a fight between the Appellant and Wendy Bardales. (RR XXIX at 8). Wendy Bardales came over to the Appellant's apartment. (RR XXIX at 9). At some point the Appellant asked her to leave but she ignored him. (RR XXIX at 9). After being asked several more times, the Appellant grabbed Wendy Bardales' hair, pushed her and kicked her in the butt as she was leaving. (RR XXIX at 9). Celeste Munoz heard Wendy Bardales scream "Fuck LTC" and then tell the Appellant that she was going to have someone kill him. (RR XXIX at 10). Appellant would have liked to call Celeste Munoz to establish the previous bad blood between Wendy Bardales and the Appellant. He did not present the testimony of Celeste Munoz, however, because it would have opened the door to the Appellant's extraneous offenses. (RR XXIX at 13).

The defense called a former homicide investigator to the witness stand by the name of Tom Cunningham. (RR XXIX at 15). In December of 2005, Mr. Cunningham was working the night shift at the homicide division of the Houston police department. (RR XXIX at 17). Officer Cunningham took the written statement from Wendy Bardales. (RR XXIX at 27). He took her statement within

four hours of the murder. (RR XXIX at 29). Officer Cunningham understood Ms. Bardales and did not feel the need to get an interpreter because she spoke English fine. (RR XXIX at 27). Ms. Bardales never asked for an interpreter. (RR XXIX at 28). According to her written statement, Wendy Bardales described the shooter as follows:

> I got a good look at his face. **I have never seen him before**. He was Hispanic and about 16 to 17 years of old. He was around 5 foot 5 inches to 5 foot 7 inches tall. I remember him having a dark birthmark on his face but I can't remember exactly where he was -- I can't remember exactly where. He was very skinny and clean shaven. He had black hair. It was short. He had a fade-type haircut. He was wearing a black sweatshirt, hooded jacket, and khaki pants.

(RR XXIX at 33) (emphasis added).

Officer Cunningham was certain that the information he put into Wendy Bardales statement was accurate with respect to what Wendy Bardales told him. (RR XXIX at 57). An officer that spoke Spanish was available to translate, but Officer Cunningham did not need his services. (RR XXIX at 59).

The State attempted to explain away the numerous inconsistencies in Wendy Bardales' testimony by claiming that Wendy was "in shock".[1] (RR XXX at 35, 38) and that there was a "lack of communication". (RR XXV at 57).

---

[1] "And she was in such shock at that moment, she didn't recognize the defendant." (RR 30 at 35). "I would submit to you that she was in shock." (RR 30 at 38).

18

ISSUE NUMBER ONE: WAS THE EVIDENCE LEGALLY SUFFICIENT TO SUPPORT THE VERDICT?

(RR XXIV at 30 – RR XXIX at 69)

A.     Standard of review.

The due process clause protects those accused of crimes against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crimes with which they are charged. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072 (1970). In any criminal proceeding, the State is required to prove beyond a reasonable doubt all essential elements of a crime. TEX. CRIM. PROC. CODE ANN. art. 38.03; *Smith v. State,* 986 S.W.2d 86, 87 (Tex. App. - Houston [1st Dist.] 1999, pet. ref'd).

Sufficiency of the evidence is a question of law. An appellate court reviews legal and factual sufficiency challenges using the same standard of review. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Cr. App. 2010). Under the *Jackson v. Virginia* standard, evidence is insufficient to support a conviction if considering all record evidence in the light most favorable to the verdict, a factfinder could not have rationally found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); *In re Winship*, 397 U.S. 358, 361, 90 S.Ct. 1068, 1071

(1970); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Cr. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Cr. App. 2007). Evidence is insufficient under this standard in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the acts alleged do not constitute the criminal offense charged. *See Jackson*, 443 U.S. at 314, 318 n.11, 320, 99 S.Ct. at 2786, 2789 & n.11; *Laster*, 275 S.W.3d at 518; *Williams*, 235 S.W.3d at 750. The sufficiency of the evidence is measured by the elements of the offense as defined in a hypothetically correct jury charge, which is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Cr. App. 1997); *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Cr. App. 2009). If an appellate court finds the evidence insufficient under this standard, it must reverse the judgment and enter an order of acquittal. *See Tibbs v. Florida*, 457 U.S. 31, 41, 102 S.Ct. 2211, 2218 (1982). The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony. TEX. CRIM. PROC. CODE ANN. art. 38.04; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App. - Houston [14th Dist.] 2000, pet. ref'd). An

appellate court does not reevaluate the weight or credibility of the evidence, nor does it substitute its own conclusions for the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Cr. App. 2000). Instead, the court resolves any inconsistencies in the evidence in favor of the final judgment and considers whether the jury reached a rational decision. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Cr. App. 2000).

The standard of review on appeal is the same for both direct and circumstantial evidence cases. *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Cr. App. 2010). Further, the law does not require that each fact, "point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Cr. App. 2007). As long as, "the verdict is supported by a reasonable inference, it is within the province of the factfinder to choose which inference is most reasonable." *Laster*, 275 S.W.3d at 523. The Appellant submits that the verdict was contrary to the evidence submitted and that the State did not meet its burden to prove every element of the offense.

B. <u>There was insufficient evidence that Appellant was the shooter.</u>

Wendy Bardales had an excellent opportunity to observe the shooter's face when the hood of his sweater came off. (RR XXV at 186). In her statement given to police a few hours after the shooting, Ms. Bardales said she got a good look at

the shooter's face. (RR XXV at 186)(RR XXVI at 54). She did not recognize the shooter at that time. (RR XXV at 186)(RR XXVI at 42). Appellant could not have been the shooter because she stated she had never seen the shooter before. (RR XXV 58, 64, 167)(RR XXVI at 54-56). Ms. Bardales said she had known the Appellant for at least a year before the shooting (RR XXVI at 69-70) and had seen him around the apartment complex just weeks before the murder. (RR XXV at 59). Wendy Bardales knew the Appellant and had been over to his house on a few occasions. (RR XXV at 38)(RR XXVI at 16). Appellant was not a stranger to her and she could recognize him when she saw him at the apartment complex. (RR XXVI at 18). This was not a situation where she independently remembered who the shooter was and contacted the police. According to Ms. Bardales, she did not recognize the Appellant (whom she already knew) until she saw his picture in the photo spread. (RR XXVI at 43).

Ms. Bardales was interviewed immediately after the murder. This Court has found that the short lapse of time between the crime and identification of suspects militates against misidentification. *See Turner v. State*, 486 S.W.2d 797, 801 (Tex. Cr. App. 1972); *Garcia v. State*, 472 S.W.2d 784 (Tex. Cr. App. 1971). By the same token, the clear exclusion of a suspect coming so shortly after the crime should militate against the reliability of a future identification. According to Dr.

22

Malpass, the defense expert on eyewitness identification, the most reliable identification is the first identification. (RR XXV at 149-150).

In addition to her own statement, Ms. Bardales made several significant errors when it came to the identification of the shooter. Wendy Bardales identified the shooter as holding a black gun (RR XXVI at 78), whereas the alleged murder weapon was gray or silver. (RR XXVI at 79). According to Sergeant Ruland, Wendy Bardales' description of the gun used by the shooter did not match the murder weapon. (RR XXVII at 53-54).

Ms. Bardales claimed the shooter had a birthmark, when the Appellant had none. Ms. Bardales agreed that the Appellant has no birthmark on his face. (RR XXVI at 62). Ms. Bardales also claimed to have been shot at by the shooter, when the ballistics proved she had not been. (RR XXVIII at 121, 123).

Under these circumstances, there was insufficient evidence to prove Appellant was the shooter. Wendy Bardales simply would not have been confused as to the shooter's identity if indeed Appellant was the shooter. In summation, this jury rendered a verdict without reference to any guiding principles. Although a jury may accept or reject any or all evidence adduced, a jury may not reach a verdict based on speculation. *Johnson v. State,* 673 S.W.2d 190, 196 (Tex. Cr. App. 1984). The evidence was legally insufficient to support Appellant's conviction.

23

ISSUE NUMBER TWO: WAS THE APPELLANT DENIED HIS SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL?

(CR at 3121)(RR XXII at 5)

The Appellant was first indicted in cause number 1050630 in Harris County, Texas for the offense of capital murder. *See* TEX. PENAL CODE §19.03. The Appellant was arrested on or about December 17, 2005, as evidenced by the complaint filed in that case. While jailed in the 1050630 case, the Appellant was charged and arraigned in cause number 1064857. The indictment was prepared on 04-12-2006 and filed on 01-31-2007. (CR at 3). The Appellant was re-indicted and given the new cause number 1299912 on March 23, 2011. (CR at 55). On December 30, 2013, the Appellant was again re-indicted in cause number 1412826, the case for which he was on trial. (CR at 2).

Appellant filed a motion to dismiss for lack of speedy trial. (CR at 3121). On February 12, 2014 the trial court held a hearing on Appellant's motion. (RR XXII at 5). The State stipulated that the Appellant met his *prima facie* burden under *Barker v. Wingo*. (RR XXII at 5). The State called Mr. Spence Graham as a witness. (RR XXII at 8-9). Mr. Graham was a former prosecutor assigned to the 179th district court. Mr. Graham testified that he received the Juan Balderas case in May of 2009. (RR XXII at 9). It was one of several in a backlog of one-thousand-

and-ninety-one [1,091] cases. (RR XXII at 28, 33-34). By the time he received the Balderas case, it was already approximately four years old. (RR XXII at 23). No decision as to whether or not to seek the death penalty had been made before Mr. Graham took over the case. (RR XXII at 23). Former district attorney Graham had several conversation with defense counsel with regard to a possible plea of life. (RR XXII at 15-16). A few months after Mr. Graham received the case, Appellant provided the State with his mitigation packet. (RR XXII at 31). Approximately two years later, on April 28, 2011, the State filed a notice of intent to seek the death penalty. (RR XXII at 18). Mr. Graham testified he was ready for trial and that the case was set for trial on August 9, 2012. (RR XXII at 20). At one point the case was set for trial as a non-death capital case. (RR XXII at 30, 35). One of the reasons that caused the two year delay according to Mr. Graham, was the discovery of an extraneous offense that may have been committed by the Appellant while he was in jail. (RR XXII at 36). Another reason suggested by Mr. Graham was that the indictment had to be re-filed due to a mistakenly listed offense date. (RR XXII at 37-39). Mr. Graham admitted, however, that this was a common occurrence and usually only took a few days to fix. (RR XXII at 41). Mr. Graham left the district attorney's office for private practice in January of 2013. (RR XXII at 35).

Assistant district attorney Paula Hartman took over the Balderas case in January of 2012. (RR XXII at 43). The case was already set for trial. (RR XXII at 43). It took Ms. Hartman several months to get up to speed on the case. (RR XXII at 53). The Appellant filed a motion for continuance of the trial, which was granted in August of 2012 over the State's objection. (RR XXII at 48). The case was set to go to trial in February of 2013. (RR XXII at 50). The case was then taken off the trial docket because the judge at the time did not get re-elected. (RR XXII at 50). The trial was again continued from September of 2013 to January of 2014 due to the fact that one of the defense counsel became ill. (RR XXII at 60).

The Appellant took the stand in support of his motion. (RR XXII at 61). Mr. Balderas testified that he had been in continuous custody since 2005. (RR XXII at 61). Mr. Balderas was never admitted to bail and the length of his incarceration amounted to eight [8] years. (RR XXII at 61-62). Before his incarceration, Mr. Balderas had been preparing to enroll in architectural drafting school. (RR XXII at 62). During his eight years of incarceration he had been required to attend court approximately once a month. (RR XXII at 63). He has been unable to be employed (RR XXII at 63) and his extended incarceration has affected him severely. (RR XXII at 63). The Appellant lost family members during the time of his incarceration and he was not able to attend their funeral. (RR XXII at 63). A brother committed suicide due to having suffered the same

sexual abuse as the Appellant. (RR XXII at 75). Had he been tried earlier, his brother would have testified for Appellant on that subject. (RR XXII at 75). Appellant was not able to have any contact visits with his longtime girlfriend. (RR XXII at 72-73). Appellant suffered extreme anguish during his extended incarceration, having experienced thoughts of suicide and battling insomnia. (RR XXII at 64). His pre-trial incarceration was so lengthy that it was the subject of an article in the local paper. (RR XXII at 64). After reading the article, Appellant became educated to the speedy trial issue and decided to file a *pro se* speedy trial motion. (RR XXII at 68, 70). On January 17, 2014, Appellant filed a *pro se* motion for speedy trial. (RR XXII at 59). He had not filed any motions himself before he filed his speedy trial motion, other than a motion requesting a change in counsel. (RR XXII at 72). Defense counsel also filed a motion to dismiss for lack of speedy trial. (CR at 3121). Pursuant to an agreement with the State, the defense and State withheld presenting motions to the visiting judge, who only handled the voir dire, so that the motions could be heard by the elected judge who presided over the case. (RR XLV at 7). The State agreed that they had no objection as to the procedural timeliness of the Appellant's motion to dismiss with regard to being filed after voir dire and before the motions hearing. (RR XLV at 5).

In his argument to the trial court, Appellant pointed out that the State did not even start their attempt to meet their burden to justify the delay until four years had

27

already lapsed. (RR XXII at 80). The State never called any witnesses to justify the delay from the period 2005 through 2009. Nevertheless, the court overruled the Appellant's motion to dismiss. (CR at 3133)(RR XXII at 82).

A. Appellate courts review speedy trial issues under a bifurcated standard of review.

In reviewing the trial court's ruling on a defendant's federal constitutional speedy trial claim, appellate courts apply a bifurcated standard of review: an abuse of discretion standard for the factual components, and a *de novo* standard for the legal components. *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Cr. App. 2002); *State v. Munoz*, 991 S.W.2d 818, 821 (Tex. Cr. App. 1999). Review of the individual *Barker* factors necessarily involves fact determinations and legal conclusions, but "[t]he balancing test as a whole ... is a purely legal question."

B. The right to a speedy trial is guaranteed by the Sixth Amendment.

The Sixth Amendment to the United States Constitution provides, in relevant part, that "in all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. CONST. AMEND. VI; *Barker v. Wingo*, 407 U.S. 514, 515 (1972). This right was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. U.S. CONST. AMEND. XIV; *See Klopfer v. North*

28

*Carolina*, 386 U.S. 213, 223 (1967).  The Sixth Amendment to the United States Constitution and article I, section 10 of the Texas Constitution provide that the accused shall enjoy the right to a speedy trial. U.S. CONST. AMEND. VI; TEX. CONST. art. I, § 10.

This Court has traditionally analyzed state constitutional claims of the denial of a speedy trial under the factors established in *Barker*.  *See Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Cr. App. 2002).

C.   <u>The burden is on the prosecution and the courts to insure the Appellant receives a speedy trial.</u>

The primary burden is on the prosecution and the courts to insure that defendants are speedily brought to trial.  *See Chapman v. Evans*, 744 S.W.2d 133, 136-37 (Tex. Cr. App. 1988) (orig. proceeding) (*citing Turner v. State*, 504 S.W.2d 843, 845 (Tex. Cr. App. 1974); *McKinney v. State*, 491 S.W.2d 404, 407 (Tex. Cr. App. 1973)).  In determining whether a defendant has been denied his federal or state right to a speedy trial, a court must use a balancing test to weigh the conduct of both the State and the defendant.  *See Shaw v. State*, 117 S.W.3d 883, 888 (Tex. Cr. App. 2003) (*citing Barker*, 407 U.S. at 530).  The relevant factors to be weighed include, but are not necessarily limited to: (1) the length of the delay, (2)

29

the reasons for the delay, (3) the defendant's assertion of his speedy trial right, and (4) any prejudice to the defendant resulting from the delay. *Id.* at 888-89.

### D.     The length of the delay in this case is presumptively prejudicial.

The length of delay is a triggering mechanism for analysis of the other three *Barker* factors. *Barker*, 407 U.S. at 530-33; *State v. Munoz*, 991 S.W.2d 818, 821 (Tex. Cr. App. 1999). Unless the delay is presumptively prejudicial, a court need not inquire into the other *Barker* factors. *Id.* Generally, a delay of eight months or longer is considered "presumptively prejudicial" and triggers a speedy trial analysis. *State v. Rangel*, 980 S.W.2d 840, 843 (Tex. App. - San Antonio 1998, no pet.); *Doggett v. United States*, 505 U.S. 647, 652 n.1, 112 S.Ct. 2686, 2691 n.1 (1992) (post-accusation delay of about one year is "presumptively prejudicial"). The length of delay that will invoke such an inquiry depends upon the circumstances of each case. *Zamorano*, 84 S.W.3d at 648-49.

The United States Supreme Court has noted "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531; *Zamorano*, 84 S.W.3d at 649. If the accused demonstrates the time from accusation to trial "has crossed the threshold dividing 'ordinary' from 'presumptively prejudicial' delay, a court must then consider the extent to which that delay stretches beyond the bare minimum needed

30

to trigger judicial examination of the claim." *Zamorano*, 84 S.W.3d at 649. Therefore, a "speedy trial analysis depends first upon whether the delay is more than 'ordinary'; if so, the longer the delay beyond which is ordinary, the more prejudicial that delay is to the defendant." *Id.* The length of delay for speedy trial purposes is measured from the time the defendant is arrested or formally accused. *United States v. Marion*, 404 U.S. 307, 313 (1971).

The nearly eight year delay between Appellant's arrest and the beginning of this trial is sufficient to trigger the *Barker* analysis. *See State v. Rangel*, 980 S.W.2d 840, 843 (Tex. App. - San Antonio 1998, no pet.).

E.    The reasons for the delay weigh in favor of the Appellant.

The delays that occurred in this case were overwhelmingly due to factors beyond the Appellant's control. Admittedly, the Appellant himself requested delays at times for such reasons as the illness of counsel and the necessity of pre-trial preparation. The vast majority of the delay has been due, however, simply to the busyness of the Court itself. Although a neutral reason such as an overcrowded docket weighs less heavily against the State, it should nevertheless be considered because the ultimate responsibility for bringing cases to trial in a timely manner rests with the government. *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192; *Parkerson v. State,* 942 S.W.2d 789, 791 (Tex. App. - Fort Worth 1997, no writ).

31

F.    The Appellant was prejudiced by the delay in this case.

Prejudice, the fourth *Barker* factor, is to be considered in light of the interests that the right to a speedy trial was designed to protect. *Barker*, 407 U.S. at 532. These interests include: (1) prevention of extended pre-trial incarceration, (2) minimization of anxiety over pending charges, and (3) the prevention of actual prejudice to the defendant's ability to present a defense. *Id*. The State bears the burden of justifying the delay once the defendant makes a prima facie showing. *Rangel*, 980 S.W.2d at 843. A showing of actual prejudice is not required; a defendant need make only a prima facie showing of prejudice caused by the delay of the trial. *Munoz*, 991 S.W.2d at 826. Once the defendant has made such a showing, the burden shifts to the State. *Guajardo v. State*, 999 S.W.2d 566, 570-571 (Tex. App. - Houston [14th Dist.] 1999, pet. ref'd). "When the defendant makes a prima facie showing of prejudice, the State carries the burden of proving that the defendant 'suffered no serious prejudice beyond that which ensued from the ordinary and inevitable delay.'" *State v. Guerrero*, 110 S.W.3d 155, 162 (Tex. App. - San Antonio 2003, no pet.) (*quoting Ex parte McKenzie*, 491 S.W.2d 122, 123 (Tex. Cr. App. 1973)).

> (1) The Appellant's pre-trial incarceration has been extensive and abnormally lengthy.

The presumption that the pretrial delay has prejudiced the defendant intensifies over time. *Doggett*, 505 U.S. at 652; *State v. Jones*, 168 S.W.3d 339, 347 (Tex. App. - Dallas 2005, pet. ref'd.). Moreover, "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, . . . it is part of the mix of relevant facts, and its importance increases with the length of delay." *Doggett*, 505 U.S. at 655-56. This factor weighs heavily in favor of the Defendant. *See, e.g.*, *Shaw v. State*, 117 S.W.3d 883, 890 (Tex. Cr. App. 2003) (holding delay of thirty-eight months weighed heavily in appellant's favor); *Rodriquez v. State*, 227 S.W.3d 842, 844 (Tex. App. - Amarillo 2007, no pet.) (holding delay of thirty-two months between arrest and trial weighed heavily against the State). The assumption that prejudice increases over time is a reasonable one. Memories fade, evidence disappears, and events become more difficult to reconstruct. The delay in this case should be weighed heavily in Appellant's favor. The length of time between formal charges and the commencement of trial in the case at bar is among the very longest of previous speedy trial claims contained within the case law.

(2)   The Appellant has suffered enormous anxiety and
adverse consequences from his extended incarceration.

The Appellant's pre-trial incarceration has been both lengthy and oppressive. The Appellant has been forced to make countless fruitless trips to court, he has been denied the ability to obtain employment; he has lost any wages he might have earned from being employed, and he has been denied the ability to participate in family and other life events. Before his arrest, the Appellant planned to further his education by attending Westwood College and to obtain a degree in architectural drafting. Additionally, the Appellant has long suffered from public opprobrium by the lengthy pendency of formal criminal charges against him. A recent example of this is the Appellant being featured in an article in the local newspaper. *See* Pinkerton, James and Rogers, Brian; *"Right to a Speedy Trial? Ask these defendants"* Houston Chronicle – August 24, 2013.

The Appellant's lengthy pretrial incarceration and denial of employment and educational prospects shows prejudice, *See Stock v. State,* 214 S.W.3d 761, 766-767 (Tex. App. - Austin 2007, no pet.) as does the generally anxiety suffered by the Appellant awaiting trial. *See Zamorano v. State*, 84 S.W.3d 643 at 654. (evidence of anxiety, offered solely through the defendant's own testimony, was "some evidence" to support a finding of prejudice.).

(3)  The Appellant's ability to present a defense has been actually prejudiced by his lengthy incarceration.

"Of the forms of prejudice discussed in *Barker*, 'the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" *Dragoo v. State*, 96 S.W.3d 308, 315 (Tex. Cr. App. 2003) (quoting *Barker*, 407 U.S. at 532).

In the present case, the Appellant has been denied the availability of a primary mitigating witness. The Appellant's brother took his own life in 2011. Had this trial taken place at an earlier time, the Appellant's brother would have been a forceful mitigation witness who would have testified on the Appellant's behalf. The Appellant's brother was uniquely situated to convey to the jury certain familial mitigating circumstances. In addition to his brother, other mitigation witnesses have suffered a diminished ability to remember events of the past.

The unavailability of a witness implicates the "most serious" "sub-factor" in the prejudice analysis, "because the inability of a defendant to adequately prepare his case skews the fairness of the entire system." *Dragoo*, 96 S.W.3d at 315; *See State v. Guerrero*, 110 S.W.3d 155, 162-63 (Tex. App. - San Antonio 2003, no pet.). The loss of these witnesses and their potentially exculpatory evidence is sufficient to demonstrate prejudice. *See State v. Burckardt,* 952 S.W.2d 100, 104

35

(Tex. App. - San Antonio 1997, no pet.). The trial court should have granted Appellant's motions to dismiss for lack of a speedy trial and dismissed this case with prejudice.

ISSUE NUMBER THREE: DOES A CRIMINAL DEFENDANT HAVE A SIXTH AMENDMENT RIGHT UNDER THE UNITED STATES CONSTITUTION TO CONFRONT HIS ACCUSER IN THE ENGLISH LANGUAGE WHERE THE WITNESS SPEAKS, UNDERSTANDS, AND IS FLUENT IN ENGLISH?

(CR at 3230)(RR XXVI at 5)

Before beginning their cross-examination of Wendy Bardales, the defense filed a motion to compel her testimony in English. (CR at 3230) (RR XXVI at 5). Appellant offered the audiotape of Ms. Bardales' interview with the police, which was admitted as Defendant's Exhibit 3 for the limited purpose of the hearing. (RR XXVI at 5-6).[2] The Appellant argued as follows:

THE COURT: On the record in 1412826, the State of Texas vs. Juan Balderas, all parties are present, as is defendant. This morning the defense has filed a motion styled Motion to Compel Witness to Provide Cross-Examination Testimony in the English Language regarding the upcoming cross of Ms. Wendy Bardales. I reviewed the motion. Does the defense have anything else the Court would -- it would like the Court to consider before I make a ruling?

MR. SHEARER: Yes, Your Honor. The defense is submitting Defendant's Exhibit No. 3. We are outside the presence of the jury. This is only for the purpose of the Court's consideration of the motion. This is the audio statement of Wendy Bardales, submitting a copy to the State. I believe they have one as they provided it to us. I would

---

[2] Sergeant Ruland's audio tape recording of Wendy Bardales is a part of the record and is available as an MP3 file. It is the first file listed in the reporter's record. (Harris 1412826-RR-DX003).

37

ask the Court to admit this into evidence for the purpose of the motion only and for any potential record on appeal.

THE COURT: Do you have any -- does the State have any other evidence?

MS. DOZIER: I have not reviewed the particular DVD or CD that the defense just presented to me; however, on the representation that that is the statement taken by the officers of Wendy Bardales, I have no objection.

THE COURT: Okay. That's admitted for the limited purposes of this hearing. Defense do you have any brief argument?

MR. SHEARER: Yes, Your Honor. Just to state for the record that we think this is a – the State is improperly using the interpreter as a shield to shield Ms. Bardales' testimony so that the jury can't see that she is, in fact, not being truthful. Denies the defendant the right to cross-examination, to confront witnesses, it's unnecessary. She has repeatedly used the English language and these officers have testified that they were able to communicate with her without problems in the past. And she's since had eight years to continue to be familiar with English. She's now stated that she can even read English. So this is, in our view, an offensive weapon by the State and it denies the defendant right to due process and the right to confrontation.

THE COURT: State response.

MS. DOZIER: Your Honor, the defense cites in their brief Section 38.30; and that talks about when an interpreter must be used. It does not talk about when an interpreter may not be used. In this particular case, the witness has already indicated that although she does understand the English language and can read it and can speak it, she is more comfortable and more certain about what her understanding of everything is in the Spanish language. And that's the reason that the State is requesting an interpreter in this case. And although I have not had an opportunity to do extensive research, or much at all, I was looking in the annotations of our Code of Criminal Procedure where it talks about in Hernandez vs. State, 986 S.W.2d 817, the best practice is to err on the side of caution when there is the possibility that the

defendant will not be able to understand the proceedings in English. And I understand that that particular case refers to a defendant; however, I think the same would apply to a witness. If there is a possibility that they will not understand the proceedings and they would do a better and more accurate job in another language and an interpreter is available for that, the best practices would be to provide them an interpreter. Again, another case, Garcia vs. State, 149 S.W.3rd, 135. It says when a Trial Court is aware that the defendant -- and again, I know it refers to a defendant, but I think equally could be said for the witness -- that the defendant has a problem understanding English -- not that he doesn't understand it at all, but that he has a problem understanding English -- the defendant's right to have an interpreter translate the trial proceedings into another language must be implemented unless expressly waived. In this case, again, I think it is imperative that the witness understand what is being asked of her so that she can give true and accurate answers. She has indicated that although she does read and understand the English language, she is more comfortable and has a better comprehension in Spanish. Furthermore, I think the appropriate time for this objection would have been before she testified, at this point would only serve to confuse the jury. Again, citing the Court to, I believe, it's Rule of Evidence 101 that the purpose of the rules and the law is such that a fair proceeding can be had. And in order for this witness to fully comprehend and understand everything that's being asked of her to the best of her abilities is to have an interpreter so that she can have the information provided to her and her responses be provided back in a language that she fully understands. Defense says she's had eight years to learn English. I really don't know what she's done in the last eight years. I think at some point during her testimony she talked about at home when she's with her family, she still speaks in Spanish. So I don't know her education level. But again, I think it's always important to err on the side of caution and provide an interpreter when one is needed.

MR. SHEARER: Your Honor, in response.

THE COURT: Yes.

MR. SHEARER: Ms. Bardales' right to be comfortable must give way to the defendant's right to confront witnesses. If the Court -- it is

our position that she speaks perfect English and if you listen to the audio recording she gave to Officer Ruland, in fact she has no trouble understanding. So this is a ruse put on by the State and we ask the Court to disallow it. His right to confront witnesses is triggering right before cross-examination and that's why we filed this motion at this point after learning of the -- her information yesterday through Sergeant Ruland and some other information we've gathered in the meantime.

THE COURT: All right. The Court will agree that Ms. Bardales' rights are not equal to Mr. Balderas'. However, the record, I think, will speak for itself that there is an inherent language barrier that was evident to the Court, just in phrasings on the hearing that was conducted outside the presence of the jury yesterday and it is my belief that the jury will get an accurate -- a more accurate view of Ms. Bardales' testimony if allowed through a translator. So the motion is overruled. Anything else?

MR. SHEARER: No, Your Honor. Thank you.

THE COURT: Let's bring in the jury.

(RR XXVI at 5-10)

A.    *Appellant had a due process right to confront the witness Wendy Bardales.*

The Sixth Amendment to the United States Constitution reads in pertinent

part as follows:

In all criminal prosecutions, the accused shall enjoy the right to . . . . be confronted with the witnesses against him.

40

UNITED STATES CONSTITUTION, AMENDMENT VI.

The procedural guarantee contained within the Sixth Amendment is applicable to the States via the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065 (1965). In *Pointer*, the Court made clear that the right of an accused to be confronted with the witnesses against him must be determined by the same standards whether the right is denied in a federal or state proceeding. *Pointer,* 380 U.S. at 407-408. The Sixth Amendment to the Constitution guarantees an accused the right to be confronted with the witnesses against him. U.S. CONST. AMEND. VI; TEX. CONST. art. I, § 10; *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105 (1974). In addition to his rights under federal law, Appellant had a corresponding right to confrontation under Article I, Section 10 of the Texas Constitution. TEX. CONST. ART. I, §10.

In *Kirby v. United States*, 174 U.S. 47, 55, 56, 19 S.Ct. 574, 577 (1899) the Supreme Court referred to the right of confrontation as "(o)ne of the fundamental guaranties of life and liberty," and "a right long deemed so essential for the due protection of life and liberty that it is guarded against legislative and judicial action by provisions in the constitution of the United States and in the constitutions of most, if not of all, the states composing the Union."

The Sixth Amendment gives a criminal defendant the right "to be confronted with the witnesses against him." "This language" "comes to [the Court] on faded

41

parchment," *California v. Green*, 399 U.S. 149, 174 (1970) (Harlan, J., concurring), with a lineage that traces back to the beginnings of Western legal culture. *Coy v. Iowa*, 487 U.S. 1012, 1015, 108 S.Ct. 2798 (1988). There are indications that a right of confrontation existed under Roman law. The Roman Governor Festus, discussing the proper treatment of his prisoner, Paul, stated: It is not the manner of the Romans to deliver any man up to die before the accused has met his accusers face to face, and has been given a chance to defend himself against the charges. Acts 25:16. *Id*. It has been argued that a form of the right of confrontation was recognized in England well before the right to jury trial. *See* Pollitt, *The Right of Confrontation: Its History and Modern Dress*, 8 J.Pub.L. 381, 384-387 (1959).

The Sixth Amendment's right of an accused to confront the witnesses against him is a fundamental right. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065 (1965). The fact that this right appears in the Sixth Amendment of our Bill of Rights reflects the belief of the Framers of those liberties and safeguards that confrontation was a fundamental right essential to a fair trial in a criminal prosecution. *Id*. at 404.

**B.** *The right to confrontation includes the right to cross-examination.*

"Cross-examination is the right of the party against whom the witness is called, and the right is a valuable one as a means of separating hearsay from knowledge, error from truth, opinion from fact, and inference from recollection, and as a means of ascertaining the order of the events as narrated by the witness in his examination in chief, and the time and place when and where they occurred, and the attending circumstances, and of testing the intelligence, memory, impartiality, truthfulness, and integrity of the witness."

*The Ottawa*, 70 U.S. 268, 18 L.Ed. 165 (1866).

Cross-examination is the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. at 158 (*quoting* 5 J. Wigmore, Evidence §1367 (3d ed. 1940)).  A defendant's right 'to be confronted with the witnesses against him,' has been held to include the right to cross-examine those witnesses. *Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065 (1965).  The right to confrontation is a right designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination.  *See California v. Green*, 399 U.S. 149, 157 (1970) ("[I]t is this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause").

In *Alford v. United States*, 282 U.S. 687, 692, 51 S.Ct. 218, 219 (1931) the Court declared that the right of cross-examination is "one of the safeguards

43

essential to a fair trial." In speaking of confrontation and cross-examination the Supreme Court said they have been "zealous to protect these rights from erosion." *Greene v. McElroy*, 360 U.S. 474, 496-497, 79 S.Ct. 1400, 1413 (1959). The right to confrontation and cross-examination is well founded and universally accepted:

> There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.

*Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065 (1965).

In *Turner v. State of Louisiana*, 379 U.S. 466, 472-473, 85 S.Ct. 546, 550 (1965) the Supreme Court held: "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."

The right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable. *United States v. Abel*, 469 U.S. 45, 50 (1984); *Davis v. Alaska*, 415 U.S. 308, 316 (1974). This type of

44

evidence can make the difference between conviction and acquittal. *See Napue v.*

*Illinois*, 360 U.S. 264, 269 (1959). In *Crawford v. Washington*, 541 U.S. 36, 124

S.Ct. 1354 (2004) the Supreme Court stated that "the [Confrontation] Clause's

ultimate goal is to ensure reliability of evidence." *Crawford*, 541 U.S. at 61.

In *Alford v. United States*, 282 U.S. 687, the Court unanimously reversed a

federal conviction because the trial judge had sustained objections to questions by

the defense seeking to elicit the "place of residence" of a prosecution witness over

the insistence of defense counsel that "the jury was entitled to know 'who the

witness is, where he lives and what his business is.'" What the Court said in

reversing that conviction is fully applicable here:

> It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them . . . . To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief is to deny a substantial right and withdraw one of the safeguards essential to a fair trial . . . . The question "Where do you live?" was not only an appropriate preliminary to the cross-examination of the witness, but, on its face, without any such declaration of purpose as was made by counsel here, was an essential step in identifying the witness with his environment, to which cross-examination may always be directed. . . .

*Alford v. United States*, 282 U.S. 687, 688-689.

45

The denial of cross-examination without waiver is constitutional error of the first magnitude, and no amount of showing of want of prejudice may cure it. *See Brookhart v. Janis*, 384 U.S. 1, 3 (1966).

**C.** ***The right to cross-examination includes the right to have the trier of fact judge the witness' demeanor and manner, which includes facial expressions, tone of voice, and other verbal and non-verbal cues.***

From the earliest decisions of the Supreme Court, cross-examination has been the mechanism by which truth is discovered. This truth seeking is accomplished of a witness by "compelling him to stand face to face with the jury **in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief**." *Mattox v. United States*, 156 U.S. 237, 242-243, 15 S.Ct. 337, 339 (1895) (emphasis added).

The Confrontation Clause's central purpose, to ensure the reliability of the evidence against a defendant by subjecting it to rigorous testing in an adversary proceeding before the trier of fact, is served by the combined effects of the elements of confrontation: physical presence, oath, cross-examination, and observation of demeanor by the trier of fact. The right to confrontation includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness. One critical goal of cross-examination is to draw out

46

discrediting demeanor to be viewed by the factfinder. *See Government of Virgin Islands v. Aquino*, 378 F.2d 540, 548 (CA3 1967) ("... confrontation ordinarily secures a secondary advantage in making it possible for the tribunal before whom the witness appears to judge from his demeanor the credibility of his evidence.").

The Supreme Court has found the right of cross-examination to be fully satisfied only in cases where the fact finder can observe the witness' demeanor under cross-examination, and the witness is testifying under oath and in the presence of the accused. *See Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 295 (1985); *Ohio v. Roberts*, 448 U.S. 56, 63, n. 6 (1980). Demeanor, as the court stated in *Government of Virgin Islands v. Aquino* is of the utmost importance:

> Demeanor is of the utmost importance in the determination of the credibility of a witness. **The innumerable telltale indications which fall from a witness during the course of his examination are often much more of an indication to judge or jury of his credibility and the reliability of his evidence than is the literal meaning of his words.** Even beyond the precise words themselves lies the unexpressed indication of his alignment with one side or the other in the trial. It is indeed rarely that a cross-examiner succeeds in compelling a witness to retract testimony which is harmful to his client, but it is not infrequently that he leads a hostile witness to reveal by his demeanor-- his tone of voice, the evidence of fear which grips him at the height of cross-examination, or even his defiance-- that his evidence is not to be accepted as true, either because of partiality or overzealousness or inaccuracy, as well as outright untruthfulness. The demeanor of a witness, as Judge Frank said, is 'wordless language.' *Broadcast Music Inc. v. Havana Madrid Restaurant Corp.*, 175 F.2d 77, 80 (2 Cir. 1949). It is in recognition of the superior advantage which observation of the demeanor of the witness confers on the fact finder that a reviewing court must accept as true whatever evidence

supports the verdict of a jury and that in trials without a jury Rule 52(a) of the Federal Rules of Civil Procedure provides: 'Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.'

*Government of Virgin Islands v. Aquino*, 378 F.2d 540, 548 (CA3 1967) (emphasis added).

**D.** ***The jury was unable to judge the witness' demeanor and manner because the witness, despite her fluency in English, was allowed to testify in Spanish.***

The determination of whether an interpreter is necessary rests largely in the discretion of the trial court. *Baltierra v. State,* 586 S.W.2d 556, 557 (Tex. Cr. App. 1979). Appellant filed a motion to compel Wendy Bardales to testify in English. (CR at 3230). Appellant's motion was denied after a hearing. (CR at 3234) (RR XXVI at 5-10). Appellant objected to the use of the interpreter as being unnecessary and a violation of Appellant's rights to due process, confrontation, and cross-examination. (RR XXVI at 5-10). The jury could not notice or detect Wendy Bardales' voice inflection, facial expressions, speech patterns, etc., when the jury spoke English and the witness testified in Spanish through an interpreter. The State masked the jury's ability to detect Wendy Bardales' deception by using an unnecessary interpreter as a shield. The State effectively explained away the

48

gross inconsistencies between Wendy Bardales' testimony and the physical evidence by claiming a "lack of communication" that did not exist.

**E.** ***The witness had no need of an interpreter. The State used the interpreter as a shield to hide the witness' biased and untruthful demeanor and to explain the inconsistencies in her testimony as compared to the physical evidence.***

Where the record as a whole reflects a defendant communicates well in English the trial court's failure to provide an interpreter is not error. *Vargas v. State*, 627 S.W.2d 785, 787 (Tex. Cr. App. 1982); *Dao v. State*, 337 S.W.3d 927 (Tex. App. - Houston [14 Dist.] 2011) (results of field-sobriety tests were legally obtained though they were not performed in a person's first, or preferred, language); *compare Miller v. State,* 177 S.W.3d 1, 5 (Tex. App. - Houston [1st Dist.] 2004, no pet.), wherein the defendant "could not speak English well enough to be reliable" and "could not be effectively cross-examined [as] he could neither understand the questions, nor repeat many answers that [had] been attributed to him by the investigating officer." The mere fact that a defendant may better express himself in Spanish than English does not require that the trial court appoint an interpreter even where it has been requested. The language a witness uses to convey information in court is not subject to personal preference. In *Flores v. State*, this Court held that:

49

> [t]he mere fact that an accused may be more fluent in speaking Spanish does not, in and of itself, make it incumbent upon a trial court to appoint an interpreter for an accused who speaks and understands the English language.

*Flores v. State*, 509 S.W.2d 580 (Tex. Cr. App. 1974).

If it is not error to fail to appoint an interpreter to allow a witness to testify in the language of their preference, then the converse should also be true - where the record as a whole reflects a witness communicates well in English the trial court's failure to require the witness to speak in English should be error.

Article 38.30 of the Code of Criminal Procedure provides, in pertinent part, as follows:

> When a motion for appointment of an interpreter is filed by any party or on motion of the court, in any criminal proceeding, **it is determined that a person charged or a witness does not understand and speak the English language**, an interpreter must be sworn to interpret for the person charged or the witness.

TEX. CRIM. PROC. CODE art. 38.30. (emphasis added).

Although Article 38.30 speaks in terms of appointing an interpreter, it makes plain that an interpreter is only required where the witness does not understand and speak English. **There is no provision in the Code of Criminal Procedure**

50

**allowing a defendant or witness to employ an interpreter to testify in the language of their choosing.** English is the language spoken in Texas Courts.[3]

Insisting upon an interpreter that is unnecessary is manifestly harmful. It deprives the jury of the ability to judge the demeanor of the witness and the manner of their testimony. Wendy Bardales was the only witness who observed the shooter's face. Her testimony was crucial to the State's case.[4] She first claimed she did not know the shooter, then changed her story later to say that

---

[3] Subdivision 14 of former article 636 of the Code of Procedure made it a challenge for cause to a juror, "that he cannot read and write." *See Garcia v. State*, 12 Tex. App. 335 (Tex. Ct. App. 1882) ("The language which the juror must be able to read and write is the English language, that being the language in which the proceedings of our courts are conducted."); *Wright v. State*, 12 Tex. App. 163, 167 (1882) ("the words 'read and write' employed in the statute must be held to mean an ability to read and write the English language"); *McCampbell v. State*, 9 Tex. App. 124, 125 (1880) ("The right of a defendant charged with felony to be tried by jurors who unders[t]and the English language is not an open question in this State.") (both cases interpreting Code of Criminal Procedure, 16th Leg., R.S., § 2, art. 636(14), 1879 Tex.Crim.Stat. n.p., 77 (former 1879 TEX.CODE CRIM.P. art. 636(14), since repealed and recodified in 1895 (art. 673(14)), 1911 (art. 692(14)), 1925 (art. 616(14)), and 1965 (art. 35.16(a)(10))). In 1969, Code of Criminal Procedure article 35.16(a) was amended from "read and write" to "read or write." Act of May 13, 1969, 61st Leg., R.S., ch. 412, § 3, art. 35.16(a)(10), 1969 Tex.Gen.Laws 1364, 1365, renumbered by Act of May 5, 1983, 68th Leg., R.S., ch. 134, § 2, art. 35.16(a)(11), 1983 Tex.Gen.Laws 617, 620; *see also* TEX. CRIM. PROC. CODE ANN. art. 35.16(a)(11) (current version of the statute).

[4] The State agrees with this assessment. The importance of Wendy Bardales' testimony was referenced by the prosecutor at closing argument. ("Wendy Bardales. She saw the defendant do it. She's the only one who can come in here and testify as to the identity of the shooter because Eduardo's dead.") (RR XXX at 36).

Appellant's face looked like the shooter, then finally progressed to the point that she definitively identified Appellant as the shooter. Her credibility meant the difference between a guilty verdict and an acquittal.

The use of an unnecessary interpreter in this case is analogous to the case of *Coy v. Iowa*, 487 U.S. 1012 (1988). In *Coy v. Iowa*, the trial court granted the State's motion to place a screen between appellant and the child accusers during their testimony, which blocked him from their sight but allowed him to see them dimly and to hear them. The Supreme Court reversed, finding that the arrangement violated the defendant's right to confront his accuser. *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798 (1988). The State's employment of an unnecessary interpreter in this case was no less a shield than the screen used in *Coy*.

Article 38.30 of the Code of Criminal Procedure plainly references a "determination" being made to decide whether or not a witness, "does not understand and speak the English language. . . " TEX. CRIM. PROC. CODE ANN. art. 38.30. In this respect, the trial court erred. The overwhelming evidence showed that Wendy Bardales spoke English perfectly well:

> 1. Wendy Bardales gave a verbal statements to Sgt. Ruland in English. Sgt. Ruland testified that he had no difficulty communicating with Wendy Bardales in English (RR XXV at 80, 85) and he did not feel an interpreter was necessary. (RR XXV at 90). Sgt. Ruland testified that Wendy Bardales did not seem to have any problems communicating with him in English. She never asked him to repeat or rephrase a question.

52

(RR XXV at 104) and she did not appear to be in shock.  (RR XXV at 87).

2.     Wendy Bardales gave a verbal statement that was recorded. The audio is in English and is available for the Court to listen to.  It was entered into evidence for the appellate record after the Court denied its admission before the jury. (Harris 1412826-RR-DX003).

3.     Wendy Bardales wrote on the photo spread that she understood English.  (RR XXV at 56).

4.     Wendy Bardales spoke to the district attorney in English.  (RR XXV at 34) (RR XXIX 62-63).  She spoke to all the prosecutors two weeks before trial in English. (RR XXVI at 47).

5.     Wendy Bardales admitted that she was fluent in English.  (RR XXVI at 53).

6.     Wendy Bardales came to this country when she was 12 years of age.  (RR XXV at 35).  She was taught English in school.  (RR XXV at 35).  She was twenty-four years old at the time of trial. (RR XXV at 33).  She had twelve years to learn English before testifying.

7.     Ms. Bardales testified that she read English at the time of trial. (RR XXV at 69).

8.     Ms. Bardales occasionally blurted out answers in English before the translator could finish translating.  (RR XXVI at 53).

9.     The State *conceded* that Ms. Bardales spoke English. (RR XXIX at 62-63).

It was not necessary that Wendy Bardales spoke perfect English (though she did).  All that was required was that she speak English "reasonably well."  *See*

53

*Diaz v. State*, 491 S.W.2d 166 (Tex. Cr. App. 1973) (no reversible error in failing

to appoint interpreter because was ample evidence that appellant understood and

communicated in the English language reasonably well). The prosecution's use of

an unnecessary interpreter dovetailed nicely with their claim of a non-existent

language barrier:

> "You have the evidence in front of you. You have her statement to the police. And I want you to think about a couple of things. She testified that she did not recognize the defendant that night. Her statement said she had never seen him before. So which is it? You heard how the statement was taken. So take it for what it's worth. You heard Officer Cunningham talk about how he would get the information from her and there's some information he couldn't have gotten from anyone else, her name, her date of birth, some of the facts of the case but that he would take her information **and then he would translate it into words that regular people could understand** and that sometimes he would ask her questions and then he would just turn the question around based on her answer. He told you that it's her information but those are his words. So, think about it. What was the question that he asked her. Did you recognize him? Or was it, Had you seen him there before? **And what was the translation of what she said.** And do you think that if you didn't recognize somebody that night when you were giving a statement, do you think you might tell the police no, to the question had you ever seep [sic] him before. I mean, if your brain isn't making that connection at that moment, how can you say you've seen him before? You don't recognize him at that moment, and I can tell you that she didn't. So why didn't she recognize him that night? Was it because she hadn't seen him in a while? Was it because she wasn't expecting to see him under those circumstances? Was it because she was in shock? Or all of the above. Why didn't -- why didn't she recognize him that night? I don't know. I would say probably a combination of all of those things."

(RR XXX at 39-40) (emphasis added).

54

But that next day when they came back to clear up Sergeant Ruland's confusion, because if you remember, that Wendy Bardales said she was never confused, she knew who it was. **It was Sergeant Ruland who was confused about her words not about her identification.**

MR. SHEARER: Objection, Your

MR. SHEARER: Objection, Your Honor.  That's a misstatement of the record. Improper jury argument.

THE COURT: Overruled.

MS. DOZIER: He said he was confused by her choice of words. And you know, eventually he recognized that there was some disconnect there. **There was some language gap or communication gap** when Wendy said, here, let me write it. Let me write it in Spanish what I mean. "Yo estoy positiva que el es que mato a Eduardo." I am positive that he is the one who killed Eduardo. When she could write it in Spanish, there was no confusion. And that's exactly what she wrote on the back of the photo spread.  Wendy Bardales is not, was not, and never was confused about her identification. She's been positive from the moment she saw the photo spread with the defendant's photograph in it. She recognized him immediately upon being presented that photo spread. She went back to that night in her mind and everything popped and she knew it was Juan Balderas. It was Apache.  Now, they tried to discredit Wendy by focusing on her request to use a translator here in the courtroom. And I find that interesting because if somebody had trouble walking but they could walk, but because they have an occasional balance problem, maybe they use a cane or a walker, you would never make fun of them or try to discredit them. It's the same thing here. You remember when we first started questioning her, we made no bones about the fact that she spoke English and she met with us in English and all of our discussions were at in English but that at some point in our discussion she said, can I have a translator in trial so that I am certain what people are asking me so that I can give the right

55

answers. Doesn't that kind of make sense? **Don't you want somebody to come into court and be able to give the truth and not have any miscommunications there like there had been up until this point.** So if you think about it, having a translator makes sense. That way there could be no miscommunication. It's not that she didn't speak English. I think that was clear.

(RR XXX at 46-47) (emphasis added).

#### F. *Appellant was harmed by the error.*

Appellant was unnecessarily deprived of the ability to test the credibility of the State's crucial witness through cross-examination. His right to confrontation was therefore denied. Harmless error analysis for Confrontation Clause violations assumes that "the damaging potential of the cross-examination [would have been] fully realized." *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438 (1986). Here, the Appellant was effectively deprived of the ability to test the credibility of the complaining witness through cross-examination. So much of the truth testing function of cross-examination is lost when an interpreter must be used. The jurors, who did not speak Spanish,[5] would not have been able to compare Ms. Bardales' answers to cross-examination questions with her manner and demeanor.

---

[5] Two of the jurors were in fact bilingual. When they raised a concern about the accuracy of the interpreter's translation, they were admonished to go by the official translation from the interpreter and not to rely on their own understanding. (RR XXXIX at 25-32).

The jury sent out two notes asking for read backs concerning her previous relationship with the Appellant. The jury specifically mentioned the word "credibility" of Wendy Bardales in both their notes. (CR at 3295, 3297). It was an obvious and crucial issue. Had the Appellant been able to cross-examine Wendy Bardales in English, her demeanor and manner would have exposed her as a biased witness who minimized her previous involvement with Appellant. She would have been seen for what she was – a rival gang witness with an axe to grind, who had previously threatened to have the Appellant killed.[6] Had the jury been able to observe her manner and demeanor, the inconsistencies between her trial testimony and her statements to police would have been credited by the jury in Appellant's favor, tipping the balance from a previously hung jury[7] to an acquittal.

The harm was especially significant given that the interpreter was completely and totally unnecessary. One of the prosecutors frankly admitted that the interpreter was present simply for the "comfort" of the witness. (RR XXIX 62-63).

---

[6] Although, for reasons of strategy, Appellant was not able to present this evidence before the jury, a witness for the defense testified outside the record to this fact. (RR XXIX at 8 - 4).

[7] *See* jury note. (CR at 3312).

ISSUE NUMBER FOUR: IF A CRIMINAL DEFENDANT DOES NOT HAVE A SIXTH AMENDMENT RIGHT UNDER THE UNITED STATES CONSTITUTION TO CONFRONT HIS ACCUSER IN ENGLISH, DOES HE AT LEAST HAVE THE RIGHT TO CROSS-EXAMINE AND IMPEACH HIS ACCUSER CONCERNING HER ABILITY TO SPEAK ENGLISH SO THAT THE JURY MIGHT BE MADE AWARE OF HER ATTEMPT TO MASK THE EXTENT OF HER FLUENCY?

(RR XXIX 62-63)

Just before resting their case, the defense offered into evidence the audiotape recording taken by Sergeant Ruland of Wendy Bardales. The colloquy proceeded as follows:

THE COURT: How is it not hearsay?

MR. NUNNERY: Judge, we are offering it to show the capability of Wendy to communicate in English. That's the primary purpose of the offer. Any other legal reasons, I'll turn over to Scott.

MS. McFADEN: Judge, the ability to speak English is not disputed. When Ms. Dozier first started questioning Ms. Bardales, she made clear that she could speak English, that there had been several conversations had between the State and the witness in English and that the reason she was testifying through an interpreter was for the comfort and complete comprehension of the witness for both direct and cross.
There was never anything put out there by the State that she couldn't speak English. So I believe the Court's definitely right, one, that it is hearsay; but I think they're trying to backdoor impeach a witness by something we haven't even brought up.

MR. SHEARER: Your Honor, we have cases that we can provide to the Court that show whether she can speak English and her ability to speak English is subject to cross-examination. They have indicated

58

she's not comfortable speaking English and we would proffer that the audiotape, she speaks perfect English. Since we can cross-examine on whether -- and to what extent she understands English, then it's improper (sic) impeachment to show the jury to the extent that she can speak English and is comfortable speaking it. She never asked for an interpreter, she never indicates that she's having a hard time, she never indicates that she doesn't understand the officer, and all her answers are appropriate answers in English.

THE COURT: The tape is not coming in. I think it's been made clear that she, both from her and from cross, that she never did ask for an interpreter and one clearly was not provided for her. So I will let the jury make any conclusions about her ability to speak English from the testimony from the live witnesses.

(RR XXIX at 62-63).

Whether and to what extent Wendy Bardales spoke the English language was an appropriate issue for the jury. *Cf. Garcia v. State*, 887 S.W.2d 862, 875 (Tex. Cr. App. 1994) ("As a question of fact, appellant must settle the question of a translation's accuracy at trial by impeaching the translation; cross-examination of the witness presents the most convenient vehicle, but impeachment may be accomplished by many other means."); *Cf. State v. Burris,* 131 Ariz. 563, 643 P.2d 8, 14 (App. 1982) (The accuracy of the sworn interpreter's interpretation may be impeached and is ultimately to be determined by the jury); *see United States v. Manos,* 848 F.2d 1427, 1432-3 (7th Cir.1988) (questioning of translation could be probed thoroughly upon cross examination); *see also* J.E. Macy, Annotation, *Use of Interpreter in Court Proceedings*, 172 A.L.R. 923 (1948) (The interpreter is a

witness in the sense that the accuracy of his translation is a question of fact for the jury).

The State raised the issue by bringing an interpreter. Wendy Bardales gave the vast majority of her testimony in Spanish. Tellingly, however, she answered several questions in English before the interpreter had time to translate. (RR XXVI at 53). Of obvious significance, therefore, was the taped interview between Sergeant Ruland and Wendy Bardales that was made just after the shooting. Appellant moved to introduce the tape to show the jury that Wendy Bardales' use of an interpreter was contrived. The trial court denied its admission. (RR XXVI at 5-10). The audio statement was admitted for the appellate record, however, and is available to this Court.[8] On this recording, Wendy Bardales is heard speaking in perfect English – eight [8] years before her testimony in court.

Whether and to what extent Wendy Bardales spoke English was a proper subject for cross-examination and impeachment. The trial court erred by refusing to allow the audiotape into evidence. This was an error of law that requires a new trial. Appellant suffered obvious harm. At trial, Ms. Bardales falsely claimed that she could barely speak English at the time of the murder:

---

[8] Sergeant Ruland's audio tape recording of Wendy Bardales is a part of the record and is available as an MP3 file. It is the first file listed in the reporter's record. (Harris 1412826-RR-DX003).

(QUESTION BY MS. DOZIER) And did you speak to him in English or Spanish?

(ANSWER BY WENDY BARDALES) **I tried to talk to him in English with the little that I knew**.

(RR XXV at 189) (emphasis added).

*    *    *    *

(QUESTION BY MS. DOZIER) Since the statement was in English, might you have had trouble reviewing it for accuracy?

(ANSWER BY WENDY BARDALES) Yes, **I could barely speak**.

(QUESTION BY MS. DOZIER) Barely speak or barely speak English?

(ANSWER BY WENDY BARDALES) **Barely speak English**.

(RR XXV at 190) (emphasis added).

*    *    *    *

Q    And when you gave your statement, did they -- did the person who took your statement speak to you in English or Spanish?

A    English.

Q    **Did you understand everything that they were asking you that night?**

A    **The truth is no.**

61

Q       Is it because your English wasn't very good or because you were in shock because of what just happened or both?

A       Both.

(RR XXV at 48-49) (emphasis added).

Q       Do you think that there was some, maybe **a lack of communication** between the two of you because he was an English speaker and you were a Spanish speaker?

A       **Yes. I believe it had a lot to do, we really couldn't understand each other.**

(RR XXV at 48-49) (emphasis added).

Each and every time Wendy Bardales was confronted by the gross inconsistencies between her previous statements and her trial testimony, Wendy Bardales invoked the "no speak English" defense:

Facial identification - her statement

"I got a good look at his face."

"I have never seen him [the shooter] before"

(RR XXV at 58, 64)(RR XXVI at 54-56)

## Facial identification - her testimony

Q      The question I asked you is: You were able to tell them, quote, "I got a good look at his face."

A      Yes, I did say that.

Q      Then the next, the very next thing you told him was, quote, "I have never seen him before."

A      I don't remember saying that.

Q      Okay. You see it written there, right?

A      Yes.

Q      Okay. Do you have any reason to believe T. R. Cunningham would have typed that statement if you hadn't told him that?

A      **We hardly understood each other when I was able to tell him all this.**

*        *        *        *

Q      (BY MR. NUNNERY) You admit that in the written statement is the specific sentence, "I have never seen him before"?

A      Yes, that's what it says here.

Q      Okay. Would Cunningham of his own personal knowledge know whether you had seen that person before or not?

A      No.

Q      Do you have any reason why T. R. Cunningham would have typed that if it wasn't exactly what you told him?

**A**      He -- maybe he doesn't understand what I was trying to tell him.

(RR XXVI at 54-56)

<u>Birthmark vs. mole – her statement</u>

"I remember him having a dark birthmark on his face"

(State's Exhibit 160)

<u>Birthmark vs. mole - her testimony</u>

**Q**      Would you agree with me that's a mole?

**A**      Yes, but if -- **I didn't have anyone there that spoke Spanish or to talk to me in Spanish. If I said that and I wanted to say a birthmark -- a mole and they changed it for a birthmark because they did not understood me, there was nothing I could do there. They were not understanding me.**

(RR XXV at 72) (emphasis added).

\*      \*      \*      \*

**A**      I am saying that what I have said, **they didn't write it down in English what I was saying**, what I wanted to tell them.

(RR XXV at 73) (emphasis added).

The members of the jury, who were keenly interested in Wendy Bardales' credibility,[9] were deprived of the ability to hear Wendy Bardales' English language conversation with Sergeant Ruland, which occurred just after the murder. Had they been allowed to hear this conversation, the jury would have been made aware that the State's use of an interpreter was a mere subterfuge and that Wendy Bardales was lying about her alleged lack of proficiency in English. The audiotaped directly impeached her claim that she could not speak English proficiently. The State's attempt to explain away the inconsistencies in Wendy Bardales' story as a "lack of communication" would have been exposed. The jury would also have been able to compare the factual statements, details, and vocal tonality in her audiotaped conversations with Sergeant Ruland with her testimony at trial. Ultimately, had the audio statement been admitted, the jury would have found Ms. Bardales' claims of a language barrier to be untrue. The jury would have completely discounted her story as the biased testimony of a former rival gang member, which she was. The jury would have realized that the glaring inconsistencies in her testimony proved that she had never seen the shooter before – as Ms. Bardales herself first claimed. The discrepancies were not the subject of translation error but were due to bias, prejudice, and a lack of observation on the part of Wendy Bardales. This went to the very heart of the case – was Juan

---

[9] We know this from two of their jury notes. (CR at 3295, 3297).

Balderas the shooter?  Had the Wendy Bardales audio been admitted, Appellant would have surely been acquitted.

ISSUE NUMBER FIVE:  DID THE TRIAL COURT ABUSE ITS DISCRETION BY ALLOWING WENDY BARDALES TO TESTIFY IN SPANISH?

(RR XXIX at 62-63)

A.      Standard of review.

A trial court's decision whether or not to allow testimony through an interpreter is reviewed for an abuse of discretion.  *See Baltierra v. State,* 586 S.W.2d 556, 557 (Tex. Cr. App. 1979) (The determination of whether an interpreter is necessary rests largely in the discretion of the trial court).

B.      The trial court abused its discretion by allowing the use of an Interpreter for a witness who did not need one.

Article 38.30 of the Code of Criminal Procedure plainly references a "determination" being made to decide whether or not a witness, "does not understand and speak the English language. . . " TEX. CRIM. PROC. CODE ANN. art. 38.30.  Upon learning that Wendy Bardales actually spoke English, Appellant filed a motion requesting that she be required to undergo cross-examination in English. His motion was denied.  In this respect, the trial court erred.  The overwhelming evidence showed that Wendy Bardales spoke English perfectly well:

1.      Wendy Bardales gave a verbal statements to Sgt. Ruland in English.   Sgt. Ruland testified that he had no difficulty

67

communicating with Wendy Bardales in English (RR XXV at 80, 85) and he did not feel an interpreter was necessary. (RR XXV at 90). Sgt. Ruland testified that Wendy Bardales did not seem to have any problems communicating with him in English. She never asked him to repeat or rephrase a question. (RR XXV at 104) and she did not appear to be in shock. (RR XXV at 87).

2. Wendy Bardales gave a verbal statement that was recorded. The audio is in English and is available for the Court to listen to. It was entered into evidence for the appellate record after the Court denied its admission before the jury. (Harris 1412826-RR-DX003).

3. Wendy Bardales wrote on the photo spread that she understood English. (RR XXV at 56).

4. Wendy Bardales spoke to the district attorney in English. (RR XXV at 34) (RR XXIX 62-63). She spoke to all the prosecutors two weeks before trial in English. (RR XXVI at 47).

5. Wendy Bardales admitted that she was fluent in English. (RR XXVI at 53).

6. Wendy Bardales came to this country when she was 12 years of age. (RR XXV at 35). She was taught English in school. (RR XXV at 35). She was twenty-four years old at the time of trial. (RR XXV at 33). She had twelve years to learn English before testifying.

7. Ms. Bardales testified that she read English at the time of trial. (RR XXV at 69).

8. Ms. Bardales occasionally blurted out answers in English before the translator could finish translating. (RR XXVI at 53).

9. The State *conceded* that Ms. Bardales spoke English. (RR XXIX at 62-63).

It was not necessary that Wendy Bardales spoke perfect English (though she did). All that was required was that she speak English "reasonably well." *See Diaz v. State*, 491 S.W.2d 166 (Tex. Cr. App. 1973) (no reversible error in failing to appoint interpreter because was ample evidence that appellant understood and communicated in the English language reasonably well). One of the prosecutors frankly admitted that the interpreter was present simply for the "comfort" of the witness. (RR XXIX 62-63).

Once the State admitted Wendy Bardales spoke and understood English, the trial court should have dismissed the interpreter. *See* TEX. CRIM. PROC. CODE ANN. art. 38.30. The court's failure to do so was error.

C.      Appellant was harmed by the error.

The failure of the trial court to dispense with the interpreter deprived the jury of the ability to compare the witness' answers with her manner and demeanor. It placed an unnecessary shield between the witness and the jury. Had the jury been able to observe Wendy Bardales' manner and demeanor, the inconsistencies between her trial testimony and her statements to police would have been credited by the jury in Appellant's favor, tipping the balance from a previously hung jury[10] to an acquittal.

ISSUE NUMBER SIX: DID THE TRIAL COURT VIOLATE THE RULE OF *GASKIN V. STATE* BY PREVENTING APPELLANT FROM IMPEACHING THE WITNESS WENDY BARDALES WITH THE PRIOR AUDIOTAPED STATEMENT SHE GAVE TO THE POLICE?

(RR XXIX 62-63)

When a witness for the State has made a report or given a statement prior to testifying, the 'Gaskin Rule' attaches. A defendant, after timely and specific motion, is allowed to inspect and use such report or statement for cross-examination and impeachment purposes. This right obtains even though the witness has not used the instrument to 'refresh' his memory. *Gaskin v. State*, 172 Tex.Cr.R. 7, 353 S.W.2d 467 (1961); *Cullen v. State*, 719 S.W.2d 195, 196 (Tex. Cr. App. 1986); *White v. State*, 496 S.W.2d 642 (Tex. Cr. App. 1973); *Zanders v. State*, 480 S.W.2d 708 (Tex. Cr. App. 1972). The 'Gaskin Rule' is codified in TEX. R. EVID. 615. *See Smith v. State*, 65 S.W.3d 332, 341 (Tex. App. - Waco, 2001, no pet.) ("Rule 615 codifies and expands the Gaskin rule."). The 'Gaskin Rule' applies to a previous report or statement personally made by the witness testifying for the State and not to a report made by a person other than the witness. *Artell v. State*, 372 S.W.2d 944 (Tex. Cr. App. 1963).

---

[10] *See* jury note. (CR at 3312).

70

According to the rule, a defendant has the right to examine the recorded statement or report of a prosecution witness for the purpose of cross-examination and impeachment if the witness has testified on direct examination about the subject matter of the statement or report. *See* TEX. R. EVID. 615. As used in the rule, a "statement" of a witness includes: (2) a substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical, or other recording or a transcription thereof. TEX. R. EVID. 615(f)(2).

The Gaskin Rule applies to written as well as audio recordings of statements. *Cullen v. State*, 719 S.W.2d 195, 198 (Tex. Cr. App. 1986) ("Thus we now hold that the Gaskin rule is not limited to written statements but may also encompass tape-recorded statements and transcripts made therefrom.").

Appellant's alleged error is predicated upon an exclusion of evidence (impeachment testimony). Therefore, he must have made an offer of proof of the proposed evidence. Appellant did so by offering the tape into evidence for the appellate record. (RR XXVI at 5-6) (Harris 1412826-RR-DX003).[11]

---

[11] Just prior to Appellant offering the audio statement, the State cross-examined Appellant's witness Officer Tom Cunningham. Officer Cunningham took Wendy Bardales' written statement. The State suggested in their cross-examination of Officer Cunningham that some of her information may have been "lost in translation" (RR XXIX at 43) or may have been "miscommunicated" (RR XXIX at 44). The State also suggested that Officer Cunningham failed to take into account Wendy Bardales' thick accent. (RR XXIX at 52-53).

In the present case, the question is not one of access to the statement. Appellant was provided Wendy Bardales' audio statement. Unfortunately, having been provided the statement, he was denied its use. Wendy Bardales made numerous claims that her inconsistent testimony was the result of a language difficulty. (RR XXV at 48-49) (RR XXV at 72-73) (RR XXVI at 54-56). Appellant sought to introduce her recorded statements for the purpose of impeaching her claims of a language difficulty. (RR XXIX 62-63). This Court has found that recordings such as the one at issue come squarely within the gambit of Gaskin. *See Cullen v. State*, 719 S.W.2d 195, 198 (Tex. Cr. App. 1986) ("Clearly, if a recording consists solely of a witness relating the events of the crime with no questions by the prosecutor, Gaskin will apply.").

An examination by this Court of the audio statement will reveal that the recorded statement is entirely inconsistent with the witnesses' repeated claims that she could not be understood. The recording completely and totally rebutted the witness's assertion that she could not speak English. The audio statement of the witness Wendy Bardales has a tendency to make less probable the fact that the inconsistencies were the result of a language barrier, rather than a misidentification of the shooter. Therefore, the refusal of the trial court to allow the defendant to use the statement was error.

Appellant suffered enormous harm due to this error. Had the audiotape been admitted, Wendy Bardales' claims of a language barrier would have been exposed as a ruse by the State to explain away her gross inconsistencies. The jury would have realized she did not recognize the shooter as she first claimed. Appellant would have been found not guilty.

ISSUE NUMBER SEVEN: WAS THE APPELLANT DEPRIVED OF DUE PROCESS OF LAW AND AN IMPARTIAL JURY BY AN OUTSIDE INFLUENCE ACTING UPON THE JURY DURING THEIR DELIBERATIONS?

(RR III at 370-371)

The jury started their deliberations on the guilt/innocence of the Appellant on February 25, 2014 at 11:45 a.m. (CR at 3431). On February 26, 2014 the jury sent out a note indicating that they were deadlocked. (CR at 3312). This note was sent out at 3:42 p.m. (CR at 3312). The trial court gave the jury an *Allen* charge in response to their note and were told to continue deliberating. (RR XXXI at 24). The jury was then released for the evening at 5:09 p.m. (CR at 3431).

The jury was taken by bus from the court building. (RR XXXII at 12). As the bus was traveling on Commerce Street, several of the jurors began yelling, "He's waving at us." (RR XXXII at 12). When the deputy assigned to the jury asked who it was that was waving, the jurors responded that it was the Appellant's brother. (RR XXXII at 12). The deputy ordered the bus driver to stop the bus. (RR XXXII at 12). The jurors reported that the Appellant's brother had a smirk on his face as he waved at the jurors. (RR XXXII at 13). Every juror on the bus heard and understood what happened. (RR XXXII at 14). Several of the jurors were very alarmed by what occurred. (RR XXXII at 14). Once the bus reached the hotel, two of the female jurors commented about the incident to the deputy.

74

(RR XXXII at 15). One of the female jurors was in a state of panic and feared for her family's safety. (RR XXXII at 15).

The trial court called several of the jurors as witnesses. The first juror to testify felt that the waving incident was an attempt to threaten or intimidate the jury. (RR XXXII at 18). The jury discussed the incident in the jury room before deliberating the final day of guilt/innocence. (RR XXXII at 19). The second juror called to testify about the incident actually observed the Appellant's brother waving at the jury with a smirk on his face. (RR XXXII at 23). She heard on of the other jurors say, "Oh, my god, there's his brother." (RR XXXII at 23). The deputies stopped the bus and began chasing the brother down the street. (RR XXXII at 24). The second juror expressed her concern to the deputies and told them she was going to keep her gun closer to her that night. (RR XXXII at 26).

It was later revealed that the Appellant's brother was a diagnosed schizophrenic. (RR XLII at 52-53). He may have believed he was just being friendly with the jurors in a way that others would consider inappropriate. The jury resumed deliberations at 8:51 a.m. on the morning after the incident, which was February 27, 2014. (CR at 3432). At 11:23 a.m. the jury announced a verdict of guilty. (CR at 3432)(RR XXXII at 10).

The Appellant moved for a mistrial on the basis that the jury was subject to an outside influence. (RR XXXII at 28-29). The motion was denied. (RR XXXII

75

at 29). Having been deliberating for two entire days – and notifying the court that they were deadlocked the previous evening, the jury came back with a guilty verdict in just two [2] hours[12] on the morning following the previous night's incident.

The Sixth Amendment right to a trial by jury, enforceable against the states as a result of incorporation through the Fourteenth Amendment's due process clause, "implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Pyles v. Johnson*, 136 F.3d 986, 992 (5th Cir.1998) (quoting *Turner v. Louisiana*, 379 U.S. 466, 472-73, 85 S.Ct. 546 (1965)).

An outside influence is something outside of both the jury room and the juror. *McQuarrie v. State*, 380 S.W.3d 146 (Tex. Cr. App. 2012); *See White v. State*, 225 S.W.3d 571, 574 (Tex. Cr. App. 2007); *see also Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 370 (Tex. 2000).

When confronted with an issue of outside influence, a reviewing court must conduct an objective analysis to determine whether there is a reasonable possibility that it had a prejudicial effect on the "hypothetical average juror." *McQuarrie v.*

---

[12] The record reveals that the jury announced their verdict at 11:20 a.m. It can be inferred that they actually reached their verdict before then. It usually takes some time to get the attorneys and audience settled before formally announcing a verdict.

*State*, 380 S.W.3d 146, 155 (Tex. Cr. App. 2012); *See*, *e.g.*, *Manley v. AmBase Corp.*, 337 F.3d 237, 252 (2d Cir.2003) ("[C]ourts must apply an 'objective test,'. . . focusing on two factors: (1) 'the nature' of the information or contact at issue, and (2) 'its probable effect on a hypothetical average jury.'"); *United States v. Lloyd*, 269 F.3d 228, 238 (3d Cir.2001) ("In examining for prejudice, we must conduct 'an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror.'").

There is a reasonable possibility that the outside influence experienced by the jurors would have had a prejudicial effect on a "hypothetical average juror." As a consequence of the outside influence brought to bear on the jury, the jurors in this particular case rendered their verdict in an environment of hostility and fear. This undoubtedly led to the jury reaching a verdict of guilt that would not have been rendered under normal circumstances. It was the first issue discussed on the last day of deliberations. (RR XXXII at 19). Any rational juror holding doubts about the Appellant's guilt would have simply abandoned their previous position so as to render a quick verdict and escape the situation. As a result, this jury reached a verdict that was the product of coercion, rather than by thoughtful consideration of the evidence. Appellant has shown harm. Appellant had a right to an impartial jury unaffected by perceived threats, fear, coercion, and outside influence.

ISSUE NUMBER EIGHT: WAS THE APPELLANT DEPRIVED OF DUE PROCESS OF LAW WHEN THE TRIAL COURT FAILED TO SUPPRESS BOTH THE IN-COURT AND OUT-OF-COURT IDENTIFICATIONS OF THE APPELLANT?

(RR XXV at 179)


Appellant moved to suppress the evidence of Wendy Bardales' out-of-court identification and to prohibit her from making an in-court identification.  The trial court conducted a hearing outside the presence of the jury.

Dr. Roy Malpass was called by the defense in support of their motion to suppress the identification.  (RR XXV at 122).  Dr. Malpass is a professor at the University of Texas - El Paso.  (RR XXV at 122).  Dr. Malpass is an expert in the area of eyewitness identification.  (RR XXV at 123).  Dr. Malpass has testified in numerous state, federal, and military courts.  (RR XXV at 128, 174).  Dr. Malpass conducted a lab concerning eyewitness identification and performed experiments at UT-El Paso.  (RR XXV at 127).  Dr. Malpass has published 50 to 60 articles on eyewitness identification.  (RR XXV at 127).  Dr. Malpass served as an expert for the prosecution in the Lockerbie bombing case.  (RR XXV at 128).

Dr. Malpass reviewed Wendy Bardales' interview transcripts, the police reports, and the photo spread in this case.  (RR XXV at 134).  He also listened to the audio recording of the Wendy Bardales interview.  (RR XXV at 153).  Based upon his review of the materials, Dr. Malpass had several concerns regarding the

78

accuracy of the identification. (RR XXV at 138-139). The Appellant's photo was the only one of the six with a mark on his face and the only person wearing a hoodie. (RR XXV at 138). Dr. Malpass also testified that the manner in which Wendy Bardales arrived at her identification was suspect. (RR XXV at 145-146). The first identification given by a witness is normally the only identification valid for use as evidence. (RR XXV at 145). Dr. Malpass ultimately concluded that the photo spread was impermissibly suggestive. (RR XXV at 150-151). Dr. Malpass opined that there was a substantial likelihood of misidentification. (RR XXV at 150-151).

The trial court found that the lineup was not impermissibly suggestive. (RR XXV at 178). The trial court further found that, even it was suggestive, there was no substantial risk of misidentification. (RR XXV at 178). Appellant's motion to suppress was denied. (RR XXV at 179).

A. <u>Standard of review.</u>

A pre-trial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law. *Simmons v. United States,* 390 U.S. 377, 384 (1968); *Neil v. Biggers*, 409 U.S. 188, 196, 93 S.Ct. 375, 380 (1972); *Barley v. State*, 906 S.W.2d 27, 32– 33 (Tex. Cr. App. 1995). An in-court identification that

has been tainted by an impermissibly suggestive pretrial identification is inadmissible. *Loserth v. State*, 963 S.W.2d 770, 771-72 (Tex. Cr. App. 1998). This Court undertakes a two-step analysis to determine the admissibility of an in-court identification: 1) whether the out-of-court identification procedure was impermissibly suggestive; and 2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971 (1968); *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Cr. App. 1993); *see also Madden v. State*, 799 S.W.2d 683, 695 (Tex. Cr. App. 1990), *cert. denied*, 499 U.S. 954, 111 S.Ct. 1432 (1991). An analysis under these steps requires an examination of the "totality of the circumstances" surrounding the particular case and a determination of the reliability of the identification. *Webb v. State*, 760 S.W.2d 263, 269 (Tex. Cr. App. 1988); *Barley v. State,* 906 S.W.2d 27, 32-33 (Tex. Cr. App. 1995), *cert. denied,* 516 U.S. 1176 (1996).

The admissibility of an identification is a mixed question of law and fact that the appellate court reviews *de novo.  See Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Cr. App. 1998); *Brown v. State*, 29 S.W.3d 251, 254 (Tex. App. - Houston [14th Dist.] 2000, no pet.). The burden is upon the party challenging the identification to prove each prong by clear and convincing evidence. *Barley v. State*, 906 S.W.2d 27, 33-34 (Tex. Cr. App. 1995); *Goldberg v. State,* 95 S.W.3d

345, 378 (Tex. App. - Houston [1st Dist.] 2002, pet. ref'd), *cert. denied,* 540 U.S. 1190 (2004). If the Court determines that the identification procedure was impermissibly suggestive, it must still determine whether such suggestive pretrial procedure gave rise to a substantial likelihood of irreparable misidentification. *Moore v. State,* 140 S.W.3d 720, 731 (Tex. App. - Austin 2004, pet. ref'd) (citing *Simmons v. United States,* 390 U.S. 377, 383, 88 S. Ct. 967, 971 (1968).

Reliability is the critical question: [I]f the totality of the circumstances reveals no substantial likelihood of misidentification despite a suggestive pretrial procedure, subsequent identification testimony will be deemed "reliable," "reliability [being] the linchpin in determining the admissibility of identification testimony." *Webb v. State*, 760 S.W.2d 263, 269 (Tex. Cr. App. 1988) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243 (1977)).

The following five non-exclusive factors should be "weighed against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances":

1. The opportunity of the witness to view the criminal at the time of the crime;

2. The witness' degree of attention;

3. The accuracy of the witness' prior description of the criminal;

4. The level of certainty demonstrated by the witness at the confrontation; and

81

5.    The length of time between the crime and the confrontation....

*Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382 (1972).

B.    <u>The photo spread was impermissibly suggestive.</u>

Suggestiveness may be created by the content of the line-up or photo array itself if the suspect is the only individual closely resembling the pre-procedure description. *See Williams v. State*, 675 S.W.2d 754 (Tex. Cr. App. 1984); *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Cr. App. 1995). Furthermore, an individual procedure may be suggestive or the cumulative effect of the procedures may be suggestive. *Barley*, 906 S.W.2d at 33.

This photo array was obviously suggestive.  The Appellant's photo was the only one of the six with a mark on his face and the only person wearing a hoodie. (RR XXV at 138).  Appellant was the only individual closely resembling the pre-procedure description.  He stuck out like a sore thumb.

The case at bar is akin to that of *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127 (1969).  In *Foster*, the defendant was convicted of robbery of a Western Union office.  The office manager was the only witness to the crime.  He viewed a police station lineup of three men, including the defendant.  The defendant was almost six feet tall and was wearing a leather jacket similar to one worn by the

82

robber. The other two men in the lineup were much shorter men. The manager could not positively identify the defendant as the robber. He "thought" he was thee man but was unsure. The office manager asked for and was given a chance to speak to the defendant. The defendant was brought into an office alone and seated across from the manager at a table. The manager was still uncertain. About a week later, the manager viewed another lineup, of the defendant and four different men. This time the manager was "convinced" the defendant was the robber. He testified to the lineup identifications at the trial and repeated his identification in the courtroom. The Supreme Court held that the suggestive elements of the pre-trial identification procedure made it all but inevitable that the office manager would identify the defendant whether or not he was, in fact, "the man." The procedure undertaken so undermined the reliability of the eyewitness identification as to constitute a violation of due process. *Foster*, 394 U.S. 443.

The *Foster* court specifically pointed to the fact the defendant was wearing a jacket similar to the alleged robber as an unduly suggestive factor. *Foster*, 394 U.S. at 443. The same issue has occurred in the present case. The Appellant is the only person in the photo spread wearing the same type of jacket as the robber. (RR XXV at 138). Also, just as in *Foster*, the witness was unable to make a positive identification in the first instance and only made a definitive identification after multiple photo lineups. The *Foster* court also pointed out that the defendant

was the only person in the second lineup who also appeared in the first lineup. Like the defendant in *Foster*, Appellant's photo remained unchanged from the first photo spread to the second. (RR XXV at 119).

C. Wendy Bardales' identification was unreliable.

Considering the totality of the circumstances, Wendy Bardales' identification was unreliable. Each of the *Biggers* factors should be "weighed against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances":

    1. The opportunity of the witness to view the criminal at the time of the crime.

Wendy Bardales had an excellent opportunity to observe the shooter's face when the hood of his sweater came off. (RR XXV at 186). In her statement given to police a few hours after the shooting, Ms. Bardales said she got a good look at the shooter's face. (RR XXV at 186)(RR XXVI at 54). She did not recognize the shooter at that time. (RR XXV at 186)(RR XXVI at 42). Appellant could not have been the shooter because she stated she had never seen the shooter before. (RR XXV 58, 64, 167)(RR XXVI at 54-56). Ms. Bardales said she had known the Appellant for at least a year before the shooting (RR XXVI at 69-70) and had seen

84

him around the apartment complex just weeks before the murder. (RR XXV at 59). He was not a stranger to her and she could recognize him when she saw him at the apartment complex. (RR XXVI at 18).

### 2. The witness' degree of attention.

Ms. Bardales described herself as being frozen and unable to move as her eyes followed the shooter. (RR XXV at 184-185). The State claimed that she was "in shock." (RR XXX at 35, 38). If Wendy Bardales was in shock, as the State claimed, this would have degraded her ability to form a memory of the event. (RR XXV at 147-148).

### 3. The accuracy of the witness' prior description of the criminal.

The accuracy of the identification was way off. Wendy Bardales identified the shooter as holding a black gun (RR XXVI at 78), whereas the alleged murder weapon was gray or silver. (RR XXVI at 79). According to Sergeant Ruland, Wendy Bardales' description of the gun used by the shooter did not match the murder weapon. (RR XXVII at 53-54).

Ms. Bardales claimed the shooter had a birthmark, when the Appellant had none. Ms. Bardales agreed that the Appellant has no birthmark on his face. (RR

XXVI at 62). Ms. Bardales also claimed to have been shot at by the shooter, when the ballistics proved she had not been. (RR XXVIII at 121, 123).

4. The level of certainty demonstrated by the witness at the confrontation.

Ms. Bardales was initially certain that she had never seen the shooter before. She said so upon her first contact with the police. After first being quite certain that Appellant was not the shooter, her opinion switched one-hundred-and-eighty degrees. Six days after she gave her statement to police, she claimed the Appellant's face "looked like" the shooter's face. (RR XXV at 95-96). She was uncertain the second time she was interviewed and the interviewing officer made no attempt to classify the identification. (RR XXVII at 43). Eventually, upon the third interview, she definitively claimed that the Appellant was the shooter. Her level of certainty only got better with continued prompting by the police.

5. The length of time between the crime and the confrontation.

Ms. Bardales was interviewed immediately after the murder. This Court has found that the short lapse of time between the crime and identification of suspects militates against misidentification. *See Turner v. State*, 486 S.W.2d 797, 801 (Tex. Cr. App. 1972); *Garcia v. State*, 472 S.W.2d 784 (Tex. Cr. App. 1971). By the

86

same token, the clear exclusion of a suspect coming so shortly after the crime should militate against the reliability of a future identification. According to Dr. Malpass, the most reliable identification is the first identification. (RR XXV at 149-150).

    D.    <u>The totality of the circumstances reveal a substantial likelihood of misidentification.</u>

The present case reveals not only a substantial likelihood of misidentification – it shows a misidentification in fact. The Appellant's photo spread picture was the only picture where the person was wearing a hoodie, just like the alleged shooter. Appellant's photo was also the only one with a dark mark on the cheek of the subject. This suggestive photo found a too-willing identifier in the form of Wendy Bardales. Wendy Bardales, a childhood friend (and enemy) of the Appellant simply changed her mind about not recognizing the shooter when she saw Appellant's picture. She first claimed that that Appellant was not the shooter, then changed her mind after she noticed the Appellant's picture was included in the photo spread. This was not a situation where she independently remembered who the shooter was and contacted the police. According to Ms. Bardales, she did not recognize the Appellant (whom she already knew) until she saw his picture in the photo spread six days after the murder. (RR XXVI at 43). Even then, her identification was only tentative. It was only after her third

87

discussion with the police that she made a definitive identification. Ms. Bardales may have changed her mind and made a conscious decision to take the opportunity to pay back the Appellant for a previous altercation or she may have changed her mind unconsciously. In either case, the effect is the same. Appellant was misidentified.

There is no way that Ms. Bardales would not have recognized the Appellant immediately at the scene of the crime. She met him a year before the murder. She had hung out with him near the bus stop; been over to his apartment on multiple occasions; and had seen him around the apartment complex and at Durhan Decorado's apartment. Her seemingly extraordinary inability to recognize her child hood friend at the time of the murder is made all the more suspect given the inaccuracies of her description – a black gun that was silver; a birthmark that didn't exist; and being shot at when she wasn't. Wendy Bardales' identification was completely and totally unreliable and most likely fabricated. The most reliable identification information was conveyed in her first statement. (RR XXV at 149-150). Her subsequent identifications were too unreliable to be used in a court of law. The trial court should have granted Appellant's motion to suppress.

ISSUE NUMBER NINE: DID THE TRIAL COURT ABUSE ITS DISCRETION BY FAILING TO HAVE TESTIMONY READ BACK IN RESPONSE TO TWO JURY NOTES?

(CR at 3295, 3297)(RR XXXI at 4-7)

The jury sent out two notes asking to be read back certain testimony of Sergeant Ruland. The notes inquired about Sergeant Ruland's opinion of Wendy Bardales' credibility. The first note read:

"We would like to hear when the defense asked Officer Rulen (sic) if he would question Wendy's credibility if she knew Juan prior to the incident. Would like the question and the officer's answer."

(CR at 3295)

The trial court answered the first note as follows:

"There is no testimony in the record that is specifically responsive to the question you have asked. If you can explain the dispute that you have amongst yourselves, we may be able to find a responsive answer."

(CR at 3296)

The first jury note on the subject was soon followed by a second note by the jury, which read:

"We are trying to hear testimony where the witness was asked if Wendy's credibility would be different if there was evidence that her relationship with Juan was more involved."

89

(CR at 3297)

The trial court answered the second note as follows:

"Please be specific as to your point in dispute."

(CR at 3297)

The testimony that the jury sought was contained within Attorney Nunnery's

able cross-examination of Sergeant Ruland:

> Q    When you talked with Wendy, when did she say it was the last time
>      she'd seen Juan or Apache before this incident?
>
> A    I believe that it was approximately six months before.
>
> Q    Okay. But if she had later said to investigators or testified that it was
>      two weeks prior to the incident, would that cause you to question her
>      credibility or her veracity?
>
> A    Yes.

(RR XXVII at 52-53)(RR 49 – Def. Exhibit 9).

Appellant objected to the trial court's failure to answer the second jury note.

The colloquy proceeded as follows:

> *(Bench discussion, all parties present.)*
>
> THE COURT: So there's no disagreement about the testimony from
> Israel Diaz regarding what Apache he was wearing. The disagreement
> stems from the most recent request from the jury requesting for
> Officer

90

Ruland's testimony being questioned by the defense. The point or statement that is in dispute, "We are trying to hear testimony where the witness was asked if Wendy's credibility would be different if there was evidence that her relationship with Juan was more involved." I will note that on the question form they have written "would be different if there was evidence that her relationship" -- they have scratched out "or recognition of" and replaced "or recognition of" with "with."

MR. NUNNERY: Judge, there are two important things in that piece that the court reporter has pulled. The word "credibility" appears and also the word "seen" six months ago. Recognition, seen, and/or relationship all is encompassed in that word and I think that's precisely what they have narrowed their focus to and I think that is responsive to the question asked. And obviously if we read it and they come back and ask for additional information, we can do that, too. But there's absolutely no harm in giving them that information at this point.

MS. DOZIER: I disagree. I think they're asking about the nature of the relationship not when the last time she saw him was. And those are two very different things.

MR. NUNNERY: Judge, obviously the Court will note this is the second inquiry, so this is obviously something important to them.

MS. DOZIER: Ms. Bennett points out the fact that that information not being in testimony might be something somebody's trying to point out, too. By reading it, I think that can lead to confusion. It doesn't answer the nature of their relationship question, just when she last saw him.

THE COURT: All right. I'm going to -- I'm going to cite the instructions that are contained in this and I want them to be specific as to the point in dispute.

MS. DOZIER: Thank you.

MR. NUNNERY: Judge, for the record, we vehemently object at this point. I think now we are disrespecting the jury. They have clearly

91

indicated what it is that they want and I don't think it's fair or matter of due process to somehow allow the State to dictate what information they hear or don't hear.

MS. DOZIER: If it was clear, we wouldn't be disputing it.

MR. NUNNERY: Well, if you thought for one moment it was helpful to you, I assure you you wouldn't have any objection to it.

THE COURT: All right. I'm going to send this back now. Where is the -- I'm going to send them this back now. I'm going to let them eat because they just got breakfast a few minutes ago. Tell them that we have found testimony to their other question. We can read it now, we can let them eat. Just if you'll let them know.

MR. NUNNERY: Judge, just for the record, you are overruling my objection?

THE COURT: This is correct at this point.

MR. NUNNERY: Thank you.

(RR XXXI at 4-7).


A.    Standard of review.


Jury requests for the read back of trial testimony are governed by Article 36.28 of the code of criminal procedure.  This statute seeks to balance concern that the trial court not comment on the evidence with the need to provide the jury with the means to resolve any factual disputes it may have.  *Howell v. State*, 175 S.W.3d 786, 790 (Tex. Cr. App. 2005).  Article 36.28 provides as follows:

92

**Article 36.28.**       **Jury May Have Witness Re-Examined Or Testimony Read**

> In the trial of a criminal case in a court of record, if the jury disagree as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other; but if there be no such reporter, or if his notes cannot be read to the jury, the court may cause such witness to be again brought upon the stand and the judge shall direct him to repeat his testimony as to the point in dispute, and no other, as nearly as he can in the language used on the trial.

TEX. CRIM. PROC. CODE ANN. art. 36.28.

When asked by the jury to reread testimony, the trial court must first determine if the request is proper under article 36.28. *Iness v. State*, 606 S.W.2d 306, 314 (Tex. Cr. App. 1980). A simple request for testimony does not by itself reflect disagreement, implicit or explicit, and is not a proper request under Article 36.28. *DeGraff v. State*, 962 S.W.2d 596, 598 (Tex. Cr. App.1998). Although a simple request for testimony is insufficient to reflect a dispute, a trial judge may, in its discretion, infer a dispute in a given case. *Moore v. State*, 874 S.W.2d 671, 673 (Tex. Cr. App. 1994). The judge's inference of dispute need only have some basis other than mere speculation. *Moore*, 874 S.W.2d at 674.

After determining that jurors dispute a portion of testimony, the trial court must strike a balance between reading too much or too little testimony in response to the jury's request. *See, e.g., Jones v. State*, 706 S.W.2d 664, 668 (Tex. Cr. App.

1986) (en banc) (holding that the trial court abused its discretion by failing to have cross-examination testimony related to the disputed issue read to the jury); *Pugh v. State*, 376 S.W.2d 760, 761-62 (Tex. Cr. App. 1964) (holding that the trial court erred when, in response to the jury's request for testimony regarding the date and time of the incident, it caused the entirety of the arresting officer's testimony to be read).

In determining what testimony is to be read, the court is to interpret the jury's communication, decide what sections of testimony will best answer the inquiry, and limit the reading accordingly. *Brown v. State*, 870 S.W.2d 53, 55 (Tex. Cr. App. 1994). When reviewing a claim of error in this context, this Court looks to see whether the trial court abused its discretion in determining what sections of the testimony will best answer a request for reading of testimony. *Iness v. State*, 606 S.W.2d 306, 314 (Tex. Cr. App. 1980). This Court will not disturb the trial court's decision unless a clear abuse of discretion and harm is shown. *Jones v. State*, 706 S.W.2d 664, 668 (Tex. Cr. App. 1986). A trial court's determination of whether there is a factual dispute between jury members is reviewed for an abuse of discretion. *Robison v. State*, 888 S.W.2d 473, 480 (Tex. Cr. App. 1994), *cert. denied*, 515 U.S. 1162; *Wingo v. State*, 143 S.W.3d 178 (Tex. App. - San Antonio 2004), *aff'd*, 189 S.W.3d 270 (Tex. Cr. App. 2006). A trial

court may consider a progression of notes from the jury when attempting to fulfill the mandate of art. 36.28. *Robison,* 888 S.W.2d at 480-81.

## B. A factual dispute existed.

The plain language of article 36.28 requires only that a jury disagree about the statement of a witness before the trial court is authorized to provide a relevant portion of the reporter's notes. It does not require that the jury expressly state that it is in disagreement. *See Howell*, 175 S.W.3d at 793. A trial court may properly infer disagreement from notes that are passed between the jury and the court. *See May v. State*, 139 S.W.3d 93, 99-100 (Tex. App. - Texarkana 2004, pet. ref'd); *Keith v. State*, No. 06-06-00094-CR, 2007 WL 654282, at *4 (Tex. App. - Texarkana March 6, 2007, no pet.) (mem. op., not designated for publication); *Neal v. State*, 108 S.W.3d 577, 580–81 (Tex. App. - Amarillo 2003, no pet.) ("the context of the final note cannot be ignored. It must be considered to determine not only if a disagreement exists but also the extent of the disagreement and the appropriate response"); *Randon v. State*, 107 S.W.3d 646, 650 (Tex. App. - Texarkana 2003, no pet.) (recognizing opinions holding that a court could reasonably look at successive notes that became more narrowly tailored, combined with recitations by the trial court informing the jury it could only obtain the

95

testimony if there was a dispute about particular testimony, as adequately meeting the requirements of Article 36.28.).

In the present case, the second jury note was made after the trial court specifically instructed the jury that they were required to explain the dispute that they had amongst themselves. The jury's second note was issued with a full awareness that a dispute was required. This supports the idea that a dispute existed. *See Robison v. State*, 888 S.W.2d 473, 481 (Tex. Cr. App. 1994). The clearest message for the jury to have sent would have included a phrase to the effect that the jurors disagreed; however, after having not received the results the jury requested after the first note and then, after having received clear instructions from the court, it can be inferred that the jury's motive was to settle a disagreement as to what had been said. It was not necessary for the trial court to have repeatedly charged the jury with redundant instructions with each request. Having been instructed on the necessity of a disagreement by the trial court's answer to the first note, the trial court should have inferred that the second note indicated a disagreement in fact. *See Mendez, Jr., v. State*, No. 2-07-417-CR (Tex. App. - Fort Worth February 12, 2009) (mem. op., not designated for publication) ("We hold that it was within the trial court's discretion to infer that the jury was in dispute about the requested testimony from their request for specific testimony in response to the trial court's explicit instructions regarding the necessity of a dispute."). The

trial court simply failed to consider the progression of notes. Moreover, the jury issued their notes on a pre-printed form that asked them to identify the "Point or statement in dispute". (CR at 3295, 3297). This is further evidence of a dispute in fact. *See Guillen v. State*, No. 01-12-01085-CR (Tex. App. - Houston [1st Dist.] April 8, 2014) (mem. op., not designated for publication) ("We hold that the form as completed by the jury supports the trial court's conclusion that the jury disagreed . . .").

C.  <u>The trial court abused its discretion by failing to have testimony read back in response to the jury notes.</u>

The trial court erred by failing to have testimony read back in response to the two jury notes. The jury requests were sufficiently limited and sufficiently specific to invoke Article 36.28. In the first note the jury correctly identified the name of the witness, the side conducting the questioning, and the point in dispute. The jury specifically requested the portion of testimony where the defense asked Sergeant Ruland about his opinion of Wendy Bardales' credibility *if she knew Juan prior to the incident.* (CR at 3295) (emphasis added).

Having been rebuffed in their first attempt, the jury sent out a second note specifically requesting the testimony where the defense asked Sergeant Ruland about his opinion of Wendy Bardales' credibility *if there was evidence that her relationship with Juan was more involved.* (CR at 3297) (emphasis added).

97

Appellant objected to the failure of the trial court to require the testimony to be read back. (RR XXXI at 4-7). Appellant's proposed read back was responsive to the jury's two requests. Appellant's proposed read back was the only excerpt in the record where Sergeant Ruland was asked about Wendy Bardales' credibility *vis-à-vis* her prior relationship with the Appellant. The proposed read back question asked when Ms. Bardales had said she had last "**seen**" the Appellant "**before this incident**". While it is true that the jury spoke in slightly more general terms of whether Wendy "**knew Juan prior to the incident**" (first note) and whether she had a "**relationship**" that was "**more involved**" (second note), it should have been plain to all concerned that Appellant's proposed read back was the very passage they were seeking.

The failure to equate these jury requests with the proposed read back would lead to a myopic interpretation of Article 36.28. The jury was not required to speak "magic words" in their note or to remember the testimony verbatim. The cross-examination provision they sought for read back occurred six [6] days before they issued their jury note. (RR 27 at 52-53)(RR XXXI at 4-7). They should be forgiven such a minor lack of precision.

Given the well-defined dispute expressed in the jury notes and the fact the evidence on cross-examination clearly bore on the disputed issue, the trial court failed to give a realistic interpretation to the jury's two notes. The trial court's

failure to have Sergeant Ruland's testimony read back to the jury deprived the jury of their ability to resolve this crucial factual dispute in Appellant's favor. The trial court abused its discretion in determining that no read back was required. The trial court failed to strike the proper balance. *See Jones v. State*, 706 S.W.2d 664 (Tex. Cr. App. 1986) (trial court read too little to the jury in response to its question).

### D. Appellant was harmed by the trial court's failure to respond.

These two notes reveal a jury desperately trying to determine the credibility of Wendy Bardales. As the only eyewitness to the shooter's identity, her credibility was of the utmost importance. Ms. Bardales told the police that she had not seen the Appellant for six months before the murder. (RR XXV at 95). At trial, however, she stated that it had only been weeks since she had last seen Appellant. (RR XXV at 59). This was an obvious issue for the jury. Given the state of the evidence and the gross inconsistencies between her testimony and previous statements, it was manifestly important that the jury be provided the means to settle their factual dispute regarding Sergeant Ruland's opinion of her credibility. The trial court's failure to have the testimony read back deprived the jury of the ability to resolve this crucial credibility determination in Appellant's favor. The trial court's failure to answer the jury's notes served to unnecessarily bolster the State's case. *See Jones v. State*, 706 S.W.2d 664 (Tex. Cr. App. 1986).

99

## PRAYER FOR RELIEF

**FOR THESE REASONS,** the Appellant prays the Honorable Court of Criminal Appeals will reverse his conviction and render a verdict of not guilty, or remand the case for a new trial and grant him such further relief to which he may be entitled.

Respectfully submitted,

By: /s/ R. SCOTT SHEARER
**R. Scott Shearer**
TBA No. 00786464
917 Franiklin, Suite 320
Houston, Texas 77002
(713) 254-5629
(713) 224-2889 FAX
*ShearerLegal@Yahoo.com*

**Attorney for Appellant
(court-appointed)**

**CERTIFICATE OF COMPLIANCE WITH RULE 9.4(i)(3)**

Certificate of Compliance with Type-Volume Limitations
and Typeface Requirements.

1.    This brief complies with the type-volume limitation of TEX. R. APP. PROC. 9.4(i)(2)(A) and (3) because:

This brief contains **23,488** words, excluding the parts of the brief exempted by TEX. R. APP. PROC. 9.4(i)(1).

2.    This brief complies with the typeface requirements of TEX. R. APP. PROC. 9.4(e) because:

this brief has been prepared in a conventional proportionally spaced typeface using Microsoft WORD 97 version 7.0 in Times New Roman 14 point type.

/s/ R. SCOTT SHEARER
**R. Scott Shearer**

**CERTIFICATE OF SERVICE**

I certify that a copy of this Brief for Appellant has been served upon the State of Texas by e-mailing a copy of same to the following parties at their respective addresses on this the 25th day of April, 2015:


DISTRICT ATTORNEY'S OFFICE
A.D.A. TRACI BENNETT
*bennett_traci@dao.hctx.net*
A.D.A. CAROLINE DOZIER
*dozier_caroline@dao.hctx.net*
A.D.A. MARY MCFADEN
*mcfaden_mary@dao.hctx.net*
1201 FRANKLIN
HOUSTON, TX 77002

DISTRICT ATTORNEY'S OFFICE
A.D.A. ALAN CURRY
APPELLATE DIVISION
DISTRICT ATTORNEY'S OFFICE
1201 FRANKLIN
HOUSTON, TX 77002


/s/ R. SCOTT SHEARER
**R. Scott Shearer**